**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
(NEW HAVEN DIVISION)**

| | |
|---|---|
| IN RE: | Case No. 3:17-BK-31250 (AMN) |
| VINCENT ROSARBO & ANGELINA ROSARBO, | |
| Debtors | |
| N.V.E., INC., | |
| Movant, | |
| v. | |
| VINCENT ROSARBO and KARA S. RESCIA, CHAPTER 7 TRUSTEE, | August 23, 2017 |
| Respondents. | |

## MOTION FOR RELIEF FROM STAY FILED BY N.V.E., INC.

### PRELIMINARY STATEMENT

This is a motion on behalf of N.V.E., Inc. for relief from the automatic stay imposed by

the Debtor's, Vincent Rosarbo, August 16, 2017, bankruptcy filing.   Relief from the automatic

stay is appropriate because NVE is the plaintiff in a case against the Debtor which has been

pending for over 11 years (to which the Debtor has been a party for more than the past six years)

in the U.S. District Court for the District of New Jersey (the "Fraud Case").  On July 17, 2017,

the Honorable Madeline Cox Arleo, U.S.D.J. scheduled a preemptory trial date of September 11,

2017 for the Fraud Case.  Litigation of those issues in this Court would be intensely burdensome

to NVE and the Court, and would be enormously wasteful of previously expended legal and

{N5394873}                                1

judicial resources. Accordingly, NVE respectfully moves that the Court grant relief from the automatic stay to permit the continued prosecution of the Fraud Case in the New Jersey District Court.[1]  NVE certainly understands that a condition of this relief would likely be the requirement that it not execute on the judgment until further order of this Court.  At the same time, given the advanced progress of the Fraud Case through the New Jersey District Court litigation, it makes eminent sense to permit the continued prosecution of the case there, rather than starting anew in this Court.  The result of any final judgment in the New Jersey District Court litigation would then be entitled to res judicata application to the Adversary Proceeding instituted by NVE against the Debtor here.  See footnote 1, *infra*.

## PROCEDURAL HISTORY

NVE is a New Jersey corporation and the manufacturer of nutritional supplements and energy products. NVE employed the Debtor as a salesperson from February 5, 2001 to August 18, 2004.

On November 15, 2006, NVE began the Fraud Case by filing a 13-count complaint (the "Complaint") in the United States District Court for the District of New Jersey against a number of defendants.  After proceeding with discovery, NVE moved for leave to file an amended complaint on November 22, 2010 which was granted. NVE filed its First Amended Complaint ("FAC") on May 18, 2011. (A copy of the FAC is attached to the Affidavit of Thomas J. Sansone ("Sansone Affidavit") as Exhibit. A.)  The FAC named several new defendants, including the Debtor, and provided additional substantive allegations. *(See generally*, Sansone Affidavit, Ex. A).

---

[1] NVE has, of even date herewith, instituted an Adversary Proceeding against the Debtor, seeking a declaratory ruling that the debt owed by the Debtor to NVE is non-dischargeable because it (a) was procured by fraud or through false pretenses, (b) constituted a breach of fiduciary duty, owing to the Debtor's fraud and embezzlement of NVE's property and (c) is the result of willful and malicious behavior, perpetrated with reckless disregard for NVE's property rights.

## NATURE OF THE CLAIMS AGAINST ROSARBO

In the Fraud Case, NVE alleges that, beginning in or around June 2001 and continuing through 2010, the Debtor was at the center of a scheme designed to "steal money, products and opportunities from NVE." (FAC ¶1). Beginning in 2001, the Debtor and the co-defendant, Jesus Palmeroni ("Palmeroni"), developed a scheme whereby they would buy NVE products at the reduced international price and then sell those products to various domestic distributors, often prior customers of NVE at a price lower than charged by NVE.[2] (Sansone Affidavit, Ex. B, Deposition of Vincent Rosarbo ("Rosarbo Dep.") Tr., 69:16-136:11)

Palmeroni and the Debtor set up a company called Smart World, Inc. for the purpose of buying the products from NVE. (Id.) Palmeroni and the Debtor chose the name because it was similar to the name of one of NVE's international distributors, "Smart World, B.V." (a company based in the Netherlands). (Id.). Palmeroni and the Debtor would first place orders with NVE in the name of Smart World, B.V. for delivery in Europe. (Id.). Then, before the products could be shipped overseas, Palmeroni and the Debtor would take possession of the goods through Smart World, Inc. and divert them to a warehouse in New Jersey. (Id.). Finally, using various entities under their control, Palmeroni and the Debtor would sell the diverted products to customers in the United States. (Id. at 102:5; 151:4-21; FAC ¶ 53). NVE alleges that these customers paid millions of dollars for these products over several years, resulting in millions of dollars in tainted profits to the Debtor at NVE's expense.

---

[2] For business reasons that do not impact this motion, the wholesale price that NVE charges its international distributors is often lower than the domestic wholesale price.

## LEGAL ARGUMENT

### I.    The Bankruptcy Stay Should be Lifted for Cause

One of the fundamental tenets of Bankruptcy law, Section 362(d) of the Bankruptcy

Code, provides in pertinent part:

> (d) On request of a party in interest and after notice and a hearing, the court shall
> grant relief from the stay provided under subsection (a) of this section, such as by
> terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in
> > property of such party in interest...

11 U.S.C. § 362(d)(1) (emphasis added).

The Second Circuit has adopted a 12-factor test "to consider when deciding whether or

not to lift a stay in order that litigation may continue to completion in another tribunal." *In re*

*Bogdanovich*, 292 F.3d 104, 110 (2d Cir. 2002) (citing *Sonnax Indus., Inc. v. Tri Component*

*Prods. Corp. (In re Sonnax Indus.),* 907 F.2d 1280, 1285–1286 (2d Cir. 1990)). The 12 factors

are:

> (1) whether relief would result in a partial or complete resolution
> of the issues;
>
> (2) lack of any connection with or interference with the bankruptcy
> case;
>
> (3) whether the other proceeding involves the debtor as a fiduciary;
>
> (4) whether a specialized tribunal with the necessary expertise has
> been established to hear the cause of action;
>
> (5) whether the debtor's insurer has assumed full responsibility for
> defending it;
>
> (6) whether the action primarily involves third parties;
>
> (7) whether litigation in another forum would prejudice the
> interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether the movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) [the] impact of the stay on the parties and the balance of harms.

*Id.* (quoting *In re Sonnax Indus.*, 907 F.2d at 1286). The Second Circuit has also explained that "not every one of these factors will be relevant in every case." *Id.* (citing *In re Mazzeo,* 167 F.3d at 143).

Permitting the Fraud Case to move forward in its current forum would not result in prejudice to either the bankruptcy estate or the Debtor. In fact, all parties, including the bankruptcy estate, will benefit from not having to re-litigate the complex factual and legal issues in a new forum from the beginning. Further, to the extent that the bankruptcy estate would prefer to litigate this case in Bankruptcy Court, any benefit to it in that regard is vastly outweighed by the prejudice to NVE in having to change forums after 11 years of effort in one place.

The temporal proximity of the Fraud Case to trial further supports NVE's application for modification and temporary relief from the automatic stay. Courts have granted relief from the automatic stay to unsecured creditors under the "cause" prong of §362(d) to allow matters which were on the verge of trial when bankruptcy was filed to proceed when no great prejudice to the bankruptcy estate would result. *See, e.g., In re Power Equip. Co., LLC*, 309 B.R. 552, 559 (B.A.P. 8th Cir. 2004) (concluding that the Bankruptcy Court properly lifted the stay in a case

where the related litigation was scheduled for trial within weeks of the date the bankruptcy petitions were filed); *In re McGuirt*, 61 B.R. 974, 976 (Bankr. S.D. Tex. 1986) (granting motion for relief from the automatic stay due to the fact that the state court litigation was "on the verge of trial and [could] be reached shortly"). *See also In re Gelinas*, 270 B.R. 88, 92 (Bankr. D. Conn. 2001) (lifting stay to allow a trial in state court to continue until resolution); *In re Morfopoulos*, Case No. 15-50280-AHWS (ECF #53, November 2, 2015).

Prior to the Debtor's filing for bankruptcy protection, the parties were preparing for trial. This bankruptcy proceeding was filed the day before the final pretrial conference in the Fraud Case and four weeks before the trial was scheduled to begin. It would be a significant waste of resources and would cause a detriment to the other creditors, if the parties were forced to re-litigate the issues pending or already resolved in the Fraud Case.

Relief from the automatic stay is often granted for cause when necessary to permit litigation to be *concluded* in another forum, particularly if the non-bankruptcy suit involves multiple parties or is ready for trial. *See In re Castlerock Properties,* 781 F.2d 159 (9th Cir. 1986). *See also In re Westwood Broad., Inc.*, 35 B.R. 47, 49 (Bankr. D. Haw. 1983) ("To force the Plaintiffs to proceed first only against the nondebtor defendants in the state court, then subsequently to proceed against the Debtors would result in a multiplicity of suits, involving unnecessary time and expense on the part of Plaintiffs.") The Court should grant NVE's motion because the Debtor appears to have filed his petition intentionally at this juncture, to delay the conclusion of an 11-year old case (to which he has been a party for more than six years) which involves multiple defendants on the eve of trial.

Among the other factors to be considered is the likelihood that the creditor will prevail in the litigation if their stay were lifted. *In re SCO Grp., Inc.*, 395 B.R. 852, 859 (Bankr. D. Del.

{N5394873}    6

2007) (granting relief from stay based, in part, on "a finding of a reasonable probability of success on the merits.") (citing *Int'l Business Machines v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van Co.*), 938 F.2d 731, 737 (7th Cir.1991)).  The objective evidence supporting NVE's claims in the Fraud Case is overwhelming.  The Debtor has **admitted** that he was involved in the fraudulent scheme and described how it worked, at length, during his deposition.  (See Rosarbo Dep. Tr., 69:16-136:11).  Due to the Debtor's admissions, it is highly likely that NVE will prevail on the merits of its claims against him.  Accordingly, this Court should allow the matter to proceed to trial in the District of New Jersey.

For all of these reasons, NVE respectfully requests relief from the automatic stay  to permit the trial in the Fraud Case to move forward in its forum of origin.

## CONCLUSION

For these reasons, NVE requests this Court to modify the terms of the automatic stay so as permit the U.S. District Court for the District of New Jersey to proceed with the trial in the Fraud Case, and that once a final judgment is entered in that case, it be binding upon this Court with respect to the Adversary Proceeding filed by NVE against the Debtor, objecting to discharge of NVE's debt, filed of even date herewith.

Respectfully submitted,

Date: August 23, 2017

*/s/ Thomas J. Sansone*
Thomas J. Sansone
Federal Bar No. ct00671
Carmody Torrance Sandak & Hennessey LLP
195 Church Street
New Haven, CT 06509-1950
Tel: 203-784-3100
Fax: 203-784-3199
TSansone@carmodylaw.com
*Attorneys for Creditor N.V.E., Inc.*

# EXHIBIT A

# TO

# MOTION FOR RELIEF

{}

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## (BRIDGEPORT DIVISION)

| | |
|---|---|
| In re:<br><br>VINCENT ROSARBO AND<br>ANGELINA ROSARBO<br><br>    Debtors. | Case No. 3:17-bk-31250 (AMN) |
| N.V.E., Inc.,<br><br>    Movant,<br><br>    v.<br><br>VINCENT ROSARBO and KARA S. RESCIA,<br>CHAPTER 7 TRUSTEE<br><br>    Respondents. | August 23, 2017 |

## AFFIDAVIT OF THOMAS J. SANSONE

**THOMAS J. SANSONE**, of full age, hereby certifies as follows:

1.      I am an attorney in the State of Connecticut, admitted to practice before the United States District Court for the District of Connecticut, and am a member of Carmody Torrance Sandak & Hennessey LLP, counsel for N.V.E., Inc. in the above-referenced matter. I am fully familiar with the facts set forth herein.

2.      Attached as Exhibit A is a true and correct copy of the First Amended Complaint filed on May 18, 2011 in the matter captioned, *N.V.E., Inc. v. Palmeroni, et al.*, Docket No. 2:06-cv-5455.

3.      Attached as Exhibit B are true and correct copies of the relevant pages from the transcript of the December 12, 2015 deposition of the Debtor, Vincent Rosarbo.

{N5394874}                                    1

Thomas J. Sansone

STATE OF CONNECTICUT)
                    )      ss:  New Haven                    August 23, 2017
COUNTY OF NEW HAVEN)

SUBSCRIBED AND SWORN TO before me this 23rd day of August 2017.

Mary D. Dana
Notary Public
My Commission Expires:

**MARY D. DANA**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES APRIL 30, 2019

# EXHIBIT A

## TO

## AFFIDAVIT

Samuel J. Samaro, Esq.
Aidan P. O'Connor, Esq.
Ellen W. Smith, Esq.
**PASHMAN STEIN**
A Professional Corporation
Court Plaza South
21 Main Street
Hackensack, New Jersey 07601
(201) 488-8200
Counsel for Plaintiff, **N.V.E., Inc.**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| N.V.E., INC.,<br>                    Plaintiff,<br>v. | CIVIL ACTION NO. 06-cv-5455<br>(GEB)(ES) |
| JESUS J. PALMERONI a/k/a JOSEPH PALMERONI, MICHELLE HOOEY a/k/a MICHELLE PALMERONI, MARIA C. PALMERONI, VINCENT ROSARBO, ANGELINA ROSARBO, NICOLE DILUNGO, NATIONAL RETAIL CONSULTING GROUP, INC., AMERICAN WHOLESALE DISTRIBUTION, INC., SMART WORLD, INC., FOREMOST INTERNATIONAL, GLOBAL MARKETING & SALES GROUP, LLC, VAR CONSULTING, INC., RONALD SUMICEK, SUNBELT MARKETING, INTERNATIONAL SALES GROUP,  RICHARD D. HOROWITZ, JERALD I. HOROWITZ, PROFIT MOTIVATORS, INC., PMI GLOBAL MARKETING CORP., DIRK NIEUWENHUIS, CARLOS BENGOA, CB DISTRIBUTORS, INC., DARREN HOUSEHOLDER, BRAND NEW ENERGY, INC., STEVE R. SESSIONS, SESSIONS SPECIALTY COMPANY, JARRETT W. PORTZ, JOHN J. PORTZ, SR., KATHERINE M. PORTZ,  INTERNATIONAL WHOLESALE SERVICE, INC., INTERNATIONAL WHOLESALE SUPPLY, INC., ALFREDO D. FELICE, CHARMAINE C. FELICE, CURTIS BEVERAGE, LLC, SMART WORLD (NETHERLANDS), VITAL PHARMA, T & J LIMITED, ABC COMPANIES 1-10, and JOHN DOES 1-10,<br>                    Defendants. | Document Electronically Filed<br><br>**FIRST AMENDED COMPLAINT**<br>**JURY DEMAND** |
| JESUS J. PALMERONI,<br><br>            Third-Party Plaintiff,<br><br>v.<br><br>ROBERT OCCHIFINTO and WALTER ORCUTT,<br><br>            Third-Party Defendants. | |

Plaintiff, N.V.E., Inc. ("NVE"), by and through its attorneys, Pashman Stein, a Professional Corporation, by way of amended complaint against the captioned defendants states:

## NATURE OF THE ACTION

1.    This is a case arising out of interlocking aspects of one or more conspiracies among Plaintiff's former employees and outside brokers and distributors to steal money, products and opportunities from NVE. The lynchpin of the schemes is defendant Jesus Palmeroni ("Palmeroni"), NVE's former Vice President of Sales, who initiated and orchestrated a scheme involving manipulation of accounts and kickbacks by brokers of sales commissions, and a scheme involving fraudulent misrepresentations to NVE as to the real purchaser of its products that allowed Palmeroni and Vincent Rosarbo, another NVE sales employee, to siphon off millions of dollars of NVE sales, as well as an elaborate cover up of these activities.  NVE seeks relief, including actual, punitive and treble damages, an accounting and the imposition of equitable trusts and liens on the proceeds of the nefarious schemes.

## JURISDICTION AND VENUE

2.    This action arises under 18 *U.S.C.* § 1964 and 28 *U.S.C.* § 1367, seeking an accounting, with supplemental state claims under the New Jersey RICO statute, *N.J.S.A.* 2C:41-1 et seq., civil conspiracy, fraud, interference with prospective

2

economic advantage, interference with property rights, breach of contract and breach of duty of loyalty.

3.     This Court has jurisdiction of this action under the Organized Crime Control Act of 1970, 18 *U.S.C.* § 1964 (a) and (c) (Racketeer Influenced and Corrupt Organizations); 28 *U.S.C.* §§ 1331 (federal question); 1332 (diversity); 1337 (commerce); and under the principles of supplemental jurisdiction under 28 *U.S.C.* § 1367.

4.     Personal jurisdiction and venue in this action are predicated on 28 *U.S.C.* § 1391(b) and 18 *U.S.C.* § 1965 since a substantial part of the events giving rise to the claim occurred in New Jersey.

## RELEVANT TIMES

5.     As used herein, the phrase "relevant times" refers to and includes the period commencing in or about 1999 and continuing through at least October 2009 and potentially longer, as the period during which Defendants and each of them continuously engaged in the wrongful acts described herein.

6.     Because these schemes were the product of one or more ongoing conspiracies and were affirmatively and fraudulently concealed by the defendants, the applicable statutes of limitations were tolled until NVE's recent discovery of these improper acts.

3

## PARTIES

### A.   Plaintiff

7.    Plaintiff, NVE, is a corporation organized under the laws, and a resident, of the State of New Jersey engaged in the manufacture, distribution and sale of nutritional supplements and energy drinks. Its principal place of business is located at 15 Whitehall Road, Andover, New Jersey.

### B.   Defendants

8.    Jesus "Joe" Palmeroni ("Palmeroni"), a resident of Pennsylvania, was employed for over six years in sales for NVE, rising to the position of Vice President of Sales.  Palmeroni's position gave him significant control and influence over brokers and distributors of NVE's products.

9.    Palmeroni is the sole owner or principal of defendants National Retail Consulting Group ("NRCG") and Global Marketing & Sales, LLC ("Global") and a joint owner with Vincent Rosarbo of American Wholesale Distribution, Inc. ("AWD") and Smart World, Inc. ("Smart World US") and has an interest in Foremost International ("Foremost").  Palmeroni also has interests in Curtis Beverage, LLC and Alpha Pharmaceuticals.

10.  Michelle Hooey a/k/a Michelle Palmeroni ("Hooey") is a former employee of NVE, a resident of Pennsylvania and the spouse of Palmeroni.  During the relevant time period, she aided Palmeroni's activities while she was employed by NVE.  Later while

4

employed by Lakeland Bank in NJ, she misused her position to facilitate the unlawful affairs of Palmeroni and his entities, including NRCG, generally, and through the transfer of kickbacks to them.

11.  Maria C. Palmeroni, a resident of Pennsylvania, was previously married to Palmeroni and was actively involved in the unlawful transactions of his companies, including NRCG.

12.  Vincent Rosarbo ("Rosarbo"), a resident of Connecticut, was employed by NVE as a Salesman from February 5, 2001 until August 10, 2004, when he was terminated.  Rosarbo, together with his wife, defendant Angelina Rosarbo, is the owner of defendant VAR Consulting ("VAR").  Rosarbo also owned defendants AWD and Smart World US with Palmeroni.

13.  Angelina Rosarbo, a resident of Connecticut, is a co-owner and treasurer of defendant VAR.

14.  Nicole Dilungo ("Dilungo"), a resident of Connecticut, is the daughter of Angelina Rosarbo and the stepdaughter of Rosarbo and the corporate secretary and treasurer of VAR.

15.  National Retail Consulting Group, Inc. ("NRCG"), a resident of Nevada, was owned by Palmeroni and used to launder kickbacks from brokers and as a repository of proceeds from the sale of NVE products through Smart World, American Wholesale Distribution, Inc. and VAR.  In 2006, NRCG also sold fraudulently-

obtained NVE products to Brand New Energy and others at a price
below that charged by NVE.

16.  Smart World, Inc. ("Smart World US"), a resident of
Nevada, now dissolved, was owned by Palmeroni and Rosarbo, both of
whom formed the entity on or about June 26, 2001, while employed
by NVE, using the same name as a legitimate NVE distributor, Smart
World, located in The Netherlands ("Smart World Netherlands").
Either posing as the Dutch company or in complicity with Smart
World Netherlands and its personnel, Smart World US purchased NVE
products at NVE's lower international sales price reserved for
export items and resold the products in the United States, in
competition with NVE, at prices unavailable domestically.  By at
least the end of 2002 if not before, Palmeroni and Rosarbo began
paying T & J Limited, agents of Smart World Netherlands,
"commissions" for their complicity in this scheme, eventually
totaling over $900,000.

17.  American Wholesale Distribution, Inc. ("AWD"), a
resident of Nevada, was incorporated by Palmeroni and Rosarbo on
July 9, 2001, while both were employed by NVE.  AWD purchased NVE
products from Smart World US and, in competition with NVE, resold
them domestically below the prices charged by NVE to its domestic
distributors and customers.  AWD was used as a conduit for
unlawful proceeds to pass to Palmeroni, Rosarbo or their other
entities.

6

18.    Foremost International ("Foremost") is a company located
in Carlstadt, NJ, in which Palmeroni may have an interest.
Foremost provides warehouse facilities and freight forwarding and
was used by Palmeroni to pick up and store the products from NVE
that were purchased fraudulently for Smart World US, and also to
ship these same products to domestic distributors and customers
after sale by one of Palmeroni or Rosarbo's entities.

19.    Global Marketing & Sales Group, LLC ("Global"), a
resident of Nevada, is owned by Palmeroni.  During the period 2006
to 2009 Palmeroni used Global to collect kickbacks and other
unlawful payments from other conspiring defendants, including
defendant PMI.

20.    VAR, a resident of Connecticut, formed in 2001 by the
Rosarbos, received kickbacks or other unlawful payments from
participants in the unlawful schemes described herein, including
NRCG, and was used, generally, in the sale of products
fraudulently-obtained from NVE by Smart World US and as a
repository of unlawful proceeds.

21.    Ronald Sumicek ("Sumicek") is an owner and/or principal
of defendants Sunbelt Marketing ("Sunbelt"), a broker of NVE
products, and International Sales Group ("ISG"), a distributor of
NVE products, all residents of Texas.  Sumicek and Sunbelt
conspired with Palmeroni by paying kickbacks to Palmeroni
consisting of part of commissions paid to them by NVE.  ISG, while

7

aware that Palmeroni and Rosarbo were employed by NVE, knowingly purchased fraudulently-obtained NVE products from them through NRCG and AWD at a price lower than NVE charged its domestic distributors.

22.   Sunbelt, a resident of Texas, is a broker of manufacturers' products, including NVE's.  While Palmeroni was at NVE, Sunbelt paid Palmeroni kickbacks in exchange for the assignment of favorable accounts.

23.   ISG, established by Sumicek and others and a resident of Texas, was a distributor of NVE products. While aware that Palmeroni and Rosarbo were employed by NVE, ISG knowingly purchased fraudulently-obtained NVE products from NRCG and AWD at prices lower than NVE charged its domestic distributors.  ISG is also indebted to NVE in the amount of $262,070.20 for products it purchased without payment.

24.   Richard D. Horowitz and his brother, Jerald Horowitz (the "Horowitzes"), residents of Florida, are the owners and/or principals of defendants Profit Motivators, Inc. and PMI Global Marketing Corp. (together "PMI"), brokers of NVE products.  The Horowitzes and PMI conspired with Palmeroni to kick back part of commissions paid by NVE to them.

25.   PMI and Profit Motivators, New York residents, are the brokerage businesses used by the Horowitzes, above, to kick back payments to Palmeroni.

8

26.  Dirk Nieuwenhuis ("Nieuwenhuis"), a resident of
California, is a broker or distributor of NVE products who
conspired with Palmeroni to kick back portions of commissions to
Palmeroni in exchange for the assignment of favorable accounts.

27.  Carlos Bengoa ("Bengoa") is the owner and president of
defendant CB Distributors, Inc. ("CB"), a Wisconsin resident,
which operates as a distributor for NVE products.  Bengoa and CB,
while aware that Palmeroni and Rosarbo were employed by NVE,
knowingly purchased fraudulently-obtained NVE products from them
through their companies at prices lower than NVE charged its
domestic distributors.

28.  Darren Householder ("Householder") is the President of
defendant Brand New Energy ("Brand New"), both California
residents, which operates as a distributor of NVE products.
Householder, personally, and Brand New, while aware that Palmeroni
and Rosarbo were employed by NVE, knowingly purchased
fraudulently-obtained NVE products from NRCG, AWD and VAR at
prices lower than NVE charged its domestic distributors.

29.  Steve R. Sessions is an owner of defendant Sessions
Specialty Company, both residents of North Carolina, who act as
distributors of NVE products. Sessions and Sessions Specialty
Company, while aware that Palmeroni and Rosarbo were employed by
NVE, knowingly purchased fraudulently-obtained NVE products from
AWD at prices lower than NVE charged its domestic distributors.

30.   Jarrett Portz is the president and CEO of defendants International Wholesale Service, Inc. and International Wholesale Supply, Inc., residents of Arizona.  Jarrett Portz and International Wholesale Service and International Wholesale Supply, while aware that Palmeroni and Rosarbo were employed by NVE, knowingly purchased fraudulently-obtained NVE products from AWD at prices lower than NVE charged its domestic distributors.

31.   John J. Portz, Sr. and Katherine M. Portz are officers of defendants International Wholesale Service, Inc. and International Wholesale Supply, Inc., residents of Arizona. John J. Portz, Sr. and Katherine M. Portz, while aware that Palmeroni and Rosarbo were employed by NVE, personally and for their companies knowingly purchased fraudulently-obtained NVE products from AWD.

32.   Defendants Alfredo D. Felice and Charmaine C. Felice are residents of Florida.  Charmaine C. Felice is a member manager of Curtis Beverage, LLC, a resident of Florida, in which Palmeroni has an ownership interest. The Felices, individually, and Curtis Beverage, while aware that Palmeroni and Rosarbo were employed by NVE, knowingly purchased fraudulently-obtained NVE products from AWD.

33.   Defendant Smart World (Netherlands) ("Smart World Netherlands") is a resident of The Netherlands and was a European distributor of NVE products since 1999.  Smart World

10

Netherlands conspired with Palmeroni and Rosarbo to defraud NVE
by placing orders for Smart World Netherlands, at greatly
reduced international prices, with no intention of exporting the
products from the US.  Instead, Smart World Netherlands knew
that the products would be sold by Palmeroni, Rosarbo and their
companies to NVE customers at prices that undercut the prices
charged by NVE.  In exchange, Smart World Netherlands or its
agents were paid "commissions" for participating in the
conspiracy.

34.  Defendant Vital Pharma is a resident of The
Netherlands and has some common ownership and/or relationship
with Smart World Netherlands.  Vital Pharma participated in the
fraudulent misrepresentations to NVE by placing some of the
orders for NVE products purportedly for delivery to Smart World
Netherlands.

35.  T & J Limited, a resident of The Netherlands or the
British Territory of Gibraltar, served as a conduit for the
payments made by Palmeroni, Rosarbo and Smart World US to Smart
World Netherlands for its participation in the conspiracy.
Payments from Smart World US to T & J Limited known to date
total over $900,000 between December 2002 and May 2006.

36.  Defendants ABC Companies 1-10 and John Does 1-10
represent fictitious names of presently unknown entities and
persons who participated in the schemes to defraud NVE,

11

including by paying or receiving kickbacks in connection with
sales of NVE Products or by selling or purchasing fraudulently-
obtained NVE products.

### SUBSTANTIVE FACTUAL ALLEGATIONS

**A.   Kickback of Commissions**

37.   Between approximately 1999 and his termination in
January of 2006, Palmeroni was employed by NVE as a salesman and
later, Vice President of Sales.

38.   Palmeroni's position at NVE carried responsibility for
all sales, worldwide, in a multimillion dollar business.

39.   NVE sells its products directly to consumers and
through brokers, who receive commissions on the sales they
transact.   NVE also sells products to distributors, who resell
the products to retailers at higher prices.

40.   Beginning in 2000, Palmeroni entered into secret
arrangements, unknown to NVE, with certain brokers of NVE
products, including Sumicek, the Horowitzes and Nieuwenhuis
(collectively the "Conspiring Brokers") to make illicit payments
to Palmeroni, including kickbacks on commissions, in exchange
for the assignment or manipulation of NVE accounts to the
benefit of Conspiring Brokers (the "Kickback Scheme").

41.   The Conspiring Brokers knew or should have known that
the Kickback Scheme was improper and unlawful.

12

42.   Between 2000-2005, Sunbelt Marketing received
commissions from NVE under the Kickback Scheme exceeding
$914,500 and unlawfully paid no less than $466,949.35 to
Palmeroni in kickbacks.

43.   Palmeroni directed that proceeds of the Kickback
Scheme with Sunbelt be paid to his company, NRCG.

44.   Palmeroni deposited kickbacks from Sunbelt in Lakeland
Bank in New Jersey ("Lakeland Bank") and possibly other banks as
well.

45.   Between 2001 and 2009, PMI and Profit Motivators paid
Palmeroni not less than $742,648.89 in kickbacks under the
Kickback Scheme.  Between 2001 and 2006, these monies were paid,
at Palmeroni's instructions, to NRCG.  Also pursuant to
Palmeroni's instructions, PMI, between 2006 and 2009, made
payments totaling not less than $90,000 to another Palmeroni
company, Global.

46.   Nieuwenhuis made kickback payments totaling not less
than $51,287 to NRCG between 2001-2005, and may have made
unlawful payments to other Palmeroni entities after that date.

47.   At all relevant times, Michelle Hooey, a former NVE
employee, Palmeroni's companion and later his wife, aided and
abetted Palmeroni in carrying out the Kickback Scheme, first
while she was still employed by NVE and later by actively using
her position at Lakeland Bank to deposit and transfer monies

13

among various Palmeroni or Palmeroni-controlled accounts
maintained at the Bank and elsewhere.

48.   The Conspiring Brokers knew that Palmeroni was NVE's
agent, that Palmeroni owed NVE a duty of loyalty and that the
payment of said brokerage commissions to him would be improper
and unlawful.  Nevertheless, the Conspiring Brokers agreed to
pay kickbacks to Palmeroni and/or his designees.

49.   NVE paid the Conspiring Brokers commissions by means
of periodic checks mailed from New Jersey to Texas (Sunbelt),
New York (Profit Motivators and PMI) and California
(Nieuwenhuis) throughout the relevant time period.

50.   The Conspiring Brokers illicitly paid Palmeroni or
various other of his designees, including NRCG and Group
Marketing & Sales, LLC., a portion of the commissions paid by
NVE by means of interstate commerce in cash, checks or wire
transfers.

51.   In engaging in such conduct, Palmeroni, Sumicek and
Sunbelt, the Horowitzes and Profit Motivators and PMI, and
Nieuwenhuis did agree and conspire together and with others as yet
unknown, to devise and participate in schemes and plans of deceit
in which they would and did abuse Palmeroni's fiduciary
relationship and obligations to NVE to cause financial gain to
themselves, procure unlawful commissions and divert the services,

14

assets and profits of NVE to the use and benefit of themselves and
others and to the detriment of NVE.

52.   At all relevant times, in connection with the
activities giving rise to this claim for relief, Palmeroni,
Sumicek and Sunbelt, the Horowitzs and Profit Motivators and
PMI, and Nieuwenhuis conspired with each other and with others
yet unknown to engage in the various activities set forth herein
and aided and abetted one another in such activities, all
proscribed and prohibited by 18 U.S.C. §1962(d).

**B.   Creation of Smart World and Fraudulent Misrepresentation**

53.   Beginning no later than 2001, Palmeroni and Rosarbo
conspired with a number of NVE distributors (the
"Conspiring Distributors") and other customers to distribute the
NVE products fraudulently-obtained by Smart World US, keeping
the proceeds which rightly belonged to NVE.  These products were
sold through their jointly-owned companies, AWD and Smart World,
as well as through one or more of their separately-owned
entities, including VAR and NRCG.  The proceeds of these illegal
sales were transferred to other entities Palmeroni and Rosarbo
owned and to themselves personally.

54.   During the relevant time period, Bengoa and CB made
payments totaling at least $6,000,000 for the purchase of
fraudulently-obtained NVE products from AWD, NRCG, Smart World,
and VAR and possibly from other Palmeroni or Rosarbo entities.

15

The amounts of such payments made by CB known to date are: NRCG ($35,236.64), AWD ($5,053,072.36), Smart World ($862,920.00) and VAR ($44,641.26).

55.   During the relevant time period, Householder individually made payments totaling at least $24,942 for the purchase of fraudulently-obtained NVE products from AWD.

56.   During the relevant time period, Brand New Energy made payments totaling at least $926,090 for the purchase of fraudulently-obtained NVE products from AWD, NRCG and VAR and possibly from other Palmeroni or Rosarbo entities, including payments in the first half of 2006 of at least $41,556 to VAR and at least $42,560 to NRCG.  In addition to payments made to VAR and NRCG, Brand New made payments known to date to AWD in the amount of $841,974.

57.   During the relevant time period, Sessions and Sessions Specialty Company made payments totaling at least $274,799.58 for the purchase of fraudulently-obtained NVE products from AWD and possibly other Palmeroni or Rosarbo entities.

58.   During the relevant time period, Sumicek and ISG made payments totaling at least $35,251.52 for the purchase of fraudulently-obtained NVE products from AWD and NRCG and possibly from other Palmeroni or Rosarbo entities, including purchases of at least $29,251.52 from AWD in 2004 and at least $6,000 from NRCG in 2005.

16

59.   In 2004, John J. Portz, Sr. and Katherine M. Portz
individually made payments totaling at least $50,000 for the
purchase of fraudulently-obtained NVE products from AWD.

60.   Between 2003 and 2005, International Wholesale Service
made payments totaling at least $270,951.20 to AWD for the
purchase of fraudulently-obtained NVE products.   In 2005,
International Wholesale Supply, Inc. made payments totaling at
least $19,440 to AWD for the purchase of fraudulently-obtained
NVE products.

61.   Between 2003 and 2004, Alfredo D. Felice and
Charmaine C. Felice individually made payments totaling at least
$5,031 for the purchase of fraudulently-obtained NVE products to
AWD.

62.   In 2004, Curtis Beverage, LLC made payments to AWD and
VAR totaling at least $119,124 for the purchase of fraudulently-
obtained NVE products.

63.   Palmeroni and Rosarbo conspired and entered into
secret arrangements with the Conspiring Distributors as
aforesaid for the purchase and sale of NVE products which had
been fraudulently-obtained by Smart World US at prices lower
than the legitimate prices available for NVE products in the US,
the unlawful proceeds of which went to Palmeroni, Rosarbo or
their entities.   Each of the Conspiring Distributors knew or
reasonably should have known that this secret arrangement was

17

improper and unlawful and defrauded NVE by depriving it of its
rightful sales and profits.

64.   Upon information and belief, sales of such
fraudulently-obtained NVE products may have begun before 2001
and continued after June 2006 and may include additional sales
to Conspiring Distributors as well as sales to individuals and
entities whose identities are currently concealed.

65.   Palmeroni, as NVE's Vice President of Sales, and
Rosarbo, as its salesman, were obligated to perform their duties
faithfully and loyally to NVE.

66.   In connection with the activities giving rise to these
claims for relief, each of the Defendants named herein acted
with malice, intent and knowledge and with a wanton and reckless
disregard of the rights of NVE.

67.   At all relevant times, NVE was engaged in interstate
and foreign commerce in that its products were sold throughout
the United States and abroad and these activities caused money,
products, supplies, materials, services and individuals to
travel interstate and abroad.

68.   At all relevant times and in furtherance of the
schemes and artifices to defraud and to obtain money by means of
false pretenses, defendants, on numerous occasions, used and
caused to be used mail depositories of the United States Postal

18

Service and transmitted and or received payments by checks or wire transfers in violation of 18 U.S.C. §§ 1341 and 1343.

69. At all relevant times and in execution or concealment of the schemes and artifices to defraud and obtain money by means of false pretenses, defendants, on numerous occasions, caused and induced persons to travel in interstate and foreign commerce and transported or caused to be transported money and goods of the value of five thousand dollars ($5,000) or more, each such use of interstate or foreign commerce in the execution or concealment of the scheme or artifice to defraud constituting a separate and distinct violation of 18 U.S.C. § 2314.

70. The activities of the various defendants in the formation and execution of the scheme to defraud NVE had a pervasive and debilitating impact on NVE's affairs and efforts in commerce among states of the United States and abroad. The time of NVE's management personnel and legal counsel was diverted from other potentially profitable ventures and misspent identifying or compensating for the various activities described herein. Services and assets of NVE were not only diverted into purposes that served the best interests of others and not those of NVE, but they were not then available for alternative uses and opportunities. Additional services and assets have had to be employed to keep NVE's projects profitable or to keep them from becoming unduly unprofitable. As such, Plaintiff has been

19

and is being directly and indirectly injured by the Kickback

Scheme and the purchase and sale of its products that were

fraudulently obtained.

### FIRST CAUSE OF ACTION
### RACKETEER INFLUENCED AND CORRUPT
### ORGANIZATIONS STATUTE
### (Federal Civil RICO Substance and Conspiracy)
### (ALL DEFENDANTS)

71.  NVE repeats and incorporates the preceding paragraphs

as if set forth in full herein.

72.  NVE is a "person" within the meaning of 18 U.S.C. §§

1961(3) and 1964(c).

73.  Palmeroni, Rosarbo and all other named defendants are

"persons" within the meaning of 18 U.S.C. §§ 1961(3).

74.  Palmeroni, Rosarbo and all other named defendants are

a group associated in fact and thus an "enterprise" within the

meaning of 18 U.S.C. §§ 1961(4) and 1962(c) and (d).  Said

enterprise has a hierarchical structure and differentiated roles

of its participants, with Palmeroni and Rosarbo initiating and

managing the criminal enterprise through their actions, first as

the inside men in the fraudulent scheme.

75.  The criminal enterprise set forth above engaged in

activities which affected interstate commerce, within the

meaning of 18 U.S.C. § 1962(c).

76.  Palmeroni, Rosarbo and all other named defendants and

others yet unknown conducted or participated, directly or

20

indirectly, in the conduct of the enterprise's affairs, and
conspired to do so through a pattern of racketeering activity
within the meaning of 18 U.S.C. § 1961(1)(B) and (5), to wit:

    (a)  Multiple instances of mail fraud in violation of 18
        U.S.C. § 1341;

    (b)  Multiple instances of wire fraud in violation of 18
        U.S.C. § 1343; and

    (c)  Multiple instances of transportation fraud in
        violation of 18 U.S.C. § 2314.

77.    NVE was directly and distinctly injured by Palmeroni,
Rosarbo and all other named defendants in its business and
property in an as yet undetermined amount by reason of a
violation of 18 U.S.C. § 1962(c) and (d) committed by Palmeroni,
Rosarbo and all other named defendants.

### SECOND CAUSE OF ACTION
### RACKETEER INFLUENCED AND CORRUPT
### ORGANIZATIONS STATUTE
### (Federal Civil RICO Substance and Conspiracy)
### (ALL DEFENDANTS)

78.    NVE repeats and incorporates the preceding paragraphs
as if set forth in full herein.

79.    NVE is a "person" within the meaning of 18 U.S.C. §§
1961(3) and 1964(c).

80.    Palmeroni, Rosarbo and all other named defendants are
"persons" within the meaning of 18 U.S.C. §§ 1961(3).

21

81.  NVE is an "enterprise" within the meaning of 18 U.S.C.
§§ 1961(4) and 1962(c) and (d).

82.  Palmeroni, Rosarbo and all other named defendants were
each employed by or associated with NVE, an enterprise engaged
in, and the activities of which affected, interstate and foreign
commerce within the meaning of 18 U.S.C. § 1962(c) and (d).

83.  With respect to the secret agreement among the
Defendants to defraud NVE of brokerage commissions and rightful
sales and profits of its products, Palmeroni, Rosarbo and all
other named defendants conspired to, within the meaning of 18
U.S.C. § 1962(d) and did conduct or participate, directly or
indirectly, in the conduct of NVE's affairs in a fashion
prohibited by 18 U.S.C. § 1962(c) through a pattern of activity
defined by 18 U.S.C. §§ 1961(1)(B) and (5), including:

   (a)  Multiple instances of mail fraud in violation of 18
        U.S.C. § 1341;

   (b)  Multiple instances of wire fraud in violation of 18
        U.S.C. § 1343; and

   (c)  Multiple instances of transportation fraud in
        violation of 18 U.S.C. § 2314.

84.  NVE was directly and distinctly injured by Palmeroni,
Rosarbo and all other defendants in its business and property in
an as yet undetermined amount by reason of a violation of 18

22

U.S.C. § 1962(c) and (d) committed by Palmeroni, Rosarbo and all
other named defendants.

### THIRD CAUSE OF ACTION
### NEW JERSEY RACKETEER INFLUENCED AND
### CORRUPT ORGANIZATIONS ACT
### (New Jersey Civil RICO Substantive)
### (ALL DEFENDANTS)

85.    NVE repeats and incorporates the preceding paragraphs
as if set forth in full herein.

86.    NVE is a "person" within the meaning of N.J.S.A.
2C:41-1(b).

87.    Palmeroni, Rosarbo and all other named defendants are
"persons" within the meaning of N.J.S.A. 2C:41-1(b).

88.    Palmeroni, Rosarbo and all other named defendants are
a group associated in fact and thus an "enterprise" within the
meaning of N.J.S.A. 2C:41-1(c).  Said enterprise has a
hierarchical structure and differentiated roles of its
participants, with Palmeroni and Rosarbo initiating and managing
the criminal enterprise through their actions, first as the
inside men in the fraudulent scheme.

89.    The criminal enterprise set forth above engaged in
activities which affected trade or commerce within the meaning
of N.J.S.A. 2C:41-1(h).

90.    With respect to the secret agreement among the
Defendants to defraud NVE of brokerage commissions and rightful
sales and profits of its products, Palmeroni, Rosarbo and all

23

other named defendants participated in a pattern of racketeering activity including, but not limited to theft by deception, N.J.S.A. 2C:20-4, and falsifying and tampering with the records of NVE in violation of N.J.S.A. 2C:21-4 as well as conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1)(B), pursuant to of N.J.S.A. 2C:41-1(a)(2).

91.  NVE was directly and distinctly injured by Palmeroni, Rosarbo and all other named defendants in its business and property in an as yet undetermined amount by reason of their racketeering activities.

### FOURTH CAUSE OF ACTION
### CORRUPT ORGANIZATIONS ACT
### (New Jersey Civil RICO Substantive)
### (ALL DEFENDANTS)

92.  NVE repeats and incorporates the preceding paragraphs as if set forth in full herein.

93.  NVE is a "person" within the meaning of N.J.S.A. 2C:41-1(b).

94.  Palmeroni, Rosarbo and all other named defendants are "persons" within the meaning of N.J.S.A. 2C:41-1(b).

95.  NVE is an "enterprise" within the meaning of N.J.S.A. 2C:41-1(c).

96.  Palmeroni, Rosarbo and all other named defendants were each employed by or associated with NVE, an enterprise engaged in, and the activities of which affected, trade or commerce.

24

97.  Palmeroni, Rosarbo and all other named defendants
participated through a pattern of racketeering activity
beginning in or about 2000 to at least 2006 and possibly beyond
those times, directly and indirectly, in the affairs of NVE in
violation of N.J.S.A. 2C:41-2(c).

98.  With respect to the secret agreement among the
Defendants to defraud NVE of brokerage commissions and rightful
sales and profits of its products, Palmeroni, Rosarbo and all
other named defendants participated in a pattern of racketeering
activity including, but not limited to theft by deception,
N.J.S.A. 2C:20-4 and falsifying and tampering with the records
of NVE in violation of N.J.S.A. 2C:21-4 as well as conduct
defined as "racketeering activity" under 18 U.S.C. § 1961(1)(B),
pursuant to of N.J.S.A. 2C:41-1(a)(2).

99.  NVE was directly and distinctly injured by Palmeroni,
Rosarbo and all other named defendants in its business and
property in an as yet undetermined amount by reason of the
racketeering activities of Palmeroni, Rosarbo and all other
named defendants.

**FIFTH CAUSE OF ACTION**
**NEW JERSEY RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT**
**(New Jersey Civil RICO Conspiracy)**
**(ALL DEFENDANTS)**

100. NVE repeats and incorporates the preceding paragraphs
as if set forth in full herein.

101. Defendants Palmeroni, Rosarbo and all other named
defendants, in their individual capacities and for their
individual interests, joined in conspiracies to abuse the
fiduciary relationship and trust between Palmeroni and Rosarbo
and NVE and to  abuse the discretion granted to Palmeroni and
Rosarbo by NVE; under which Defendants Palmeroni and Rosarbo
would breach their obligation of undivided loyalty and fidelity
to NVE; and Defendants would alter the records of NVE so as to
make material misrepresentations with the intent of defrauding
NVE and concealing the schemes from it.

102. Defendants Palmeroni, Rosarbo and all other named
defendants, committed wrongful acts pursuant to the conspiracies
to defraud NVE, including, but not limited to, Defendants'
actual abuse of the fiduciary relationship and trust between
Palmeroni and Rosarbo and NVE; Palmeroni and Rosarbo's breach of
their obligation of undivided loyalty and fidelity to NVE; and
Defendants' knowing, intentional and willful misrepresentations
of material fact in order to defraud NVE.

103. Said actions were taken by Palmeroni, Rosarbo and all
other named defendants in furtherance of the conspiracy to
violate N.J.S.A. 2C:41-2(b) and (c) and constitute a violation
of N.J.S.A. 2C:41-2(d).

104. NVE was directly and distinctly injured by Palmeroni,
Rosarbo and all other named defendants in its business and

property in an as yet undetermined amount by reason of the
racketeering activities of Palmeroni, Rosarbo and all other
named defendants.

### SIXTH CAUSE OF ACTION
#### FRAUD
#### (PALMERONI, HOOEY, MARIA C. PALMERONI, NRCG, GLOBAL AND CONSPIRING BROKERS)

105. NVE repeats and incorporates the preceding paragraphs
as if set forth in full herein.

106. Palmeroni, Rosarbo, Hooey, Maria Palmeroni and all
Conspiring Brokers fraudulently misrepresented the legitimacy of
their accounts to NVE so that it would pay brokerage commissions
to them, part of which was then kicked back to Palmeroni.

107. Palmeroni and the Conspiring Brokers actively
concealed, by changing NVE's records or otherwise, that they
were not entitled to all or a part of these brokerage
commissions and were kicking back a portion of them to
Palmeroni.

108. Palmeroni and the Conspiring Brokers had sole
knowledge and/or access to material facts and knew that these
facts were not known to or reasonably discoverable by NVE.

109. Palmeroni and the Conspiring Brokers intentionally and
knowingly led NVE to believe that they were entitled to these
brokerage commissions with the intent to induce NVE to continue
to pay these fraudulent brokerage commissions.

110. NVE reasonably relied to its detriment on the false

representations of defendants mentioned above, and paid

brokerage commissions on false accounts or other accounts

manipulated by Palmeroni to provide for greater commission

payments than they otherwise would have been entitled to.

111. NVE was directly and distinctly injured by Palmeroni

and the Conspiring Broker defendants in its business and

property in an as yet undetermined amount by reason of the

fraudulent misrepresentations and omissions of material fact by

these defendants.

**SEVENTH CAUSE OF ACTION**
**FRAUD-DECEIT**
**(PALMERONI, ROSARBO, SMART WORLD, INC., SMART WORLD**
**(NETHERLANDS), VITAL PHARMA AND T&J LTD. AND**
**CONSPIRING DISTRIBUTORS)**

112. NVE repeats and incorporates the preceding paragraphs

as if set forth in full herein.

113. Palmeroni and Rosarbo incorporated Smart World US

under the same name as an existing NVE distributor in The

Netherlands, Smart World, for the purpose of deceiving NVE into

believing that purchase orders from Smart World were for

products that would be exported for sale internationally, in

order to qualify for deeply reduced international prices.

114. Either posing as the Dutch company or in complicity

with it, Palmeroni and Rosarbo, directly or through their other

entities purchased NVE products as Smart World Netherlands at

28

lower, international prices, well below NVE's price to domestic distributors.

115. At a certain point, Palmeroni and Rosarbo bought Smart World Netherlands' silence and/or assistance to continue the phony international purchases.

116. Palmeroni and Rosarbo resold the products purchased for or on behalf of Smart World US to NVE distributors and other customers in the United States at a price that was lower than NVE's own price to US distributors and customers.

117. Defendants Palmeroni, Rosarbo, Smart World US and Smart World Netherlands knowingly and falsely represented to NVE that purchases were for Smart World Netherlands and for international sale.

118. NVE believed and justifiably relied upon defendants' misrepresentation that the orders entered for Smart World were for export to Smart World Netherlands and was induced by this misrepresentation to sell its products to Smart World US at the greatly reduced international price.

119. Palmeroni and Rosarbo conspired with the defendant NVE distributors to sell them these NVE products at a price lower than that offered by NVE to domestic distributors.

120. Each of the Conspiring Distributors purchased NVE products from Palmeroni, Rosarbo or one of their entities, knowing that their secret arrangement was improper and unlawful

and defrauded NVE by depriving it of its rightful sales and
profits.

121. As a result of NVE's justifiable reliance on
defendants' misrepresentations, it sustained damages, in lost
profits, sales and business opportunities in an amount not yet
fully known.

### EIGHTH CAUSE OF ACTION
#### UNLAWFUL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
#### (ALL DEFENDANTS)

122. NVE repeats and incorporates the preceding paragraphs
as if set forth in full herein.

123. NVE had a reasonable expectation of economic advantage
from the manufacture and sale of its products.

124. Defendants knew that NVE had a rightful expectancy of
economic advantage through the sale of its products.

125. Defendants, including Palmeroni, Rosarbo, their
entities and all persons associated with them, wrongfully and
without justification, interfered with NVE's expectancy of
economic advantage or benefit by inducing NVE to pay undeserved
commissions to Conspiring Brokers, part of which was kicked back
to Palmeroni; and by fraudulently obtaining NVE products and
reselling them to Conspiring Distributors who knowingly
purchasing fraudulently-obtained NVE products from Palmeroni,
Rosarbo and their entities (Conspiring Distributors).

126. In the absence of the wrongful acts of the defendants,
NVE would have realized greater profit both by paying lower
commissions to the Conspiring Brokers and by realizing its sales
potential to the Conspiring Distributors who instead ordered NVE
products from the Palmeroni and Rosarbo entities at a lower
price.

127. As the result of these wrongful acts by the
defendants, NVE sustained damages, in lost profits, sales and
business opportunities in an amount not yet fully known.

### NINTH CAUSE OF ACTION
### CIVIL CONSPIRACY
### (ALL DEFENDANTS)

128. NVE repeats and incorporates the preceding paragraphs
as if set forth in full herein.

129. Palmeroni, Rosarbo and the other named defendants
purposefully agreed to defraud NVE to secure broker commissions
and/or sell or purchase fraudulently- obtained NVE products and
acted in concert to commit the unlawful acts asserted above,
thereby causing damage to NVE.

130. NVE was directly and distinctly injured by Palmeroni,
Rosarbo and all other named defendants in its business and
property in an as yet undetermined amount by reason of the
wrongful and unlawful acts of these defendants.

31

### TENTH CAUSE OF ACTION
### INTERFERENCE WITH PROPERTY RIGHTS
### (ALL DEFENDANTS)

131. NVE repeats and incorporates the preceding paragraphs as if set forth in full herein.

132. The activities of Palmeroni, Rosarbo and the other named defendants constitute an interference with the property rights of NVE.

133. The defendants' interference with the property rights of NVE was willful and intentional.

134. NVE has sustained and will continue to sustain substantial damages as a result of the defendants' interference with its property rights in an amount that is presently undetermined.

### ELEVENTH CAUSE OF ACTION
### BREACH OF DUTY OF LOYALTY
### (PALMERONI AND ROSARBO)

135. NVE repeats and incorporates the preceding paragraphs as if set forth in full herein.

136. Palmeroni, as Vice President of Sales for NVE, and Rosarbo, as a full-time salesman for NVE, owed NVE obligations of undivided loyalty and fidelity and had a duty to act honestly and faithfully in the best interests of NVE and not for their own self-interests.

137. The aforesaid acts engaged in by Palmeroni and Rosarbo
were willful and intentional and constituted a breach of their
duties of loyal to NVE.

138. NVE has sustained substantial damages as a result of
Palmeroni and Rosarbo's breach of their duties of loyalty in an
amount that is presently undetermined.

### TWELFTH CAUSE OF ACTION
### BREACH OF CONTRACT
### (PALMERONI AND ROSARBO)

139. NVE repeats and incorporates the preceding paragraphs
as if set forth in full herein.

140. The aforesaid acts engaged in by Palmeroni and Rosarbo
constituted a breach of their contracts with NVE.

141. NVE has sustained substantial damages as a result of
Palmeroni and Rosarbo's breaches of their contracts in an amount
that is presently undetermined.

### THIRTEENTH CAUSE OF ACTION
### ACCOUNTING
### (ALL DEFENDANTS)

142. NVE repeats and incorporates the preceding paragraphs
as if set forth in full herein.

143. Palmeroni and the conspiring defendants, as a result
of the fraudulent conduct herein alleged, received and split
brokerage commissions and/or proceeds of fraudulently-obtained
NVE products, to which they were not entitled or authorized. The
full amount of such payments made to defendants for these

33

improper accounts as well as unknown others are presently
unknown to NVE.

144. NVE requests an accounting of all of the aforesaid
commission payments received by Palmeroni and the Conspiring
Brokers, and each of them, and an accounting of the proceeds of
sales of fraudulently-obtained NVE products, and payment with
interest of the amount due as a result of the accounting.

145. Palmeroni and Rosarbo received payments from the
conspiring distributors for sales of NVE products which they
fraudulently obtained. The full amount of payments made by
conspiring distributors to Palmeroni and Rosabo are presently
unknown to NVE.

146. NVE requests an accounting of all of the aforesaid
sales payments made by the conspiring distributors, and each of
them, and payment with interest of the amount due as a result of
the accounting.

### FOURTEENTH CAUSE OF ACTION
### CONSTRUCTIVE TRUST
### (ALL DEFENDANTS)

147. NVE repeats and incorporates the preceding paragraphs
as if set forth in full herein.

148. As a result of the wrongful acts of the defendants,
the defendants have been unjustly enriched.

149. NVE requests that the Court impose a constructive
trust upon the monies received by the defendants through

34

implementation of their fraudulent schemes and require

defendants to account for and return all such monies to NVE.

### FIFTEENTH CAUSE OF ACTION
### BREACH OF CONTRACT, UNJUST ENRICHMENT AND BOOK ACCOUNT
### (ISG AND SUMICEK)

150. NVE repeats and incorporates the preceding paragraphs

as if fully set forth herein.

151. ISG owes NVE $262,070.20 for NVE products it purchased

without payment. ISG and Sumicek are alter egos.

152. NVE has demanded payment, but ISG and Sumicek have

failed and refused to pay the monies owed.

153. By reason of the foregoing, ISG and Sumicek are

obligated to NVE for breach of contract, unjust enrichment and

under a book account in the amount of $262,070.20.

### PRAYER FOR RELIEF

**WHEREFORE**, NVE prays that judgment be entered against

Defendants Jesus Palmeroni, Michelle Hooey, Maria C. Palmeroni,

Vincent Rosarbo, Angelina Rosarbo, Nicole Dilungo, National

Retail Consulting Group, Inc. American Wholesale Distribution,

Inc., Smart World, Inc., Foremost International, Global

Marketing & Sales Group, LLC, VAR Consulting, Inc., Ronald

Sumicek, Sunbelt Marketing, International Sales Group, Richard

D. Horowitz, Jerald I. Horowitz, Profit Motivators, Inc., PMI

Global Marketing Corp., Dirk Nieuwenhuis, Carlos Bengoa, CB

Distributors, Inc.,  Darren Householder, Brand New Energy, Inc.,

35

Steve R. Sessions, Sessions Specialty Company, Jarrett W. Portz,
John J. Portz, Sr., Katherine M. Portz, International Wholesale
Service, Inc., International Wholesale Supply, Inc., Alfredo D.
Felice, Charmaine C. Felice, Curtis Beverage, LLC, Smart World
(The Netherlands), Vital Pharma and T & J Ltd. as follows:

### A.    Monetary Relief

1.    For damages against the defendants, and each of them,
jointly and severally, in an as yet undetermined amount duly
trebled in accordance with 18 U.S.C. § 1964(c);

2.    For damages against the defendants, and each of them,
jointly and severally, in an as yet undetermined amount duly
trebled in accordance with N.J.S.A. 2C:41-4(a)(8);

3.    For damages against ISG and Sumicek in the amount of
$262,070.20 plus interest;

3.    For punitive damages, in an amount to be determined at
trial, against the defendants, and each of them, jointly and
severally; and

4.    For the costs of investigation and litigation
reasonably incurred, as well as attorney fees in accordance with
18 U.S.C. § 1964(c).

### B.    Equitable Relief

1.    An accounting of all benefits, consideration and
profits received and/or paid, directly or indirectly, including

but not limited to, the imposition of constructive trusts with tracing;

    2.    The imposition and execution of equitable liens;

    3.    Orders of divesture of any interest, including real or personal property, money, or obligations or otherwise, wrongfully obtained, directly or indirectly, from NVE; and

    4.    Any restrictions that may be appropriate on the future conduct or activities of any person.

### C. Other Relief

For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper to award NVE complete relief.

### JURY DEMAND

Pursuant to F.R.Civ.P.38, Plaintiff hereby demands a trial by jury on each and every issue so triable.

**PASHMAN STEIN**
A Professional Corporation

Dated:  May 12, 2011      By:    *Ellen W. Smith*

                                      ELLEN W. SMITH
                                      SAMUEL J. SAMARO
                                      AIDAN P. O'CONNOR

**PASHMAN STEIN**
A Professional Corporation
Court Plaza South
21 Main Street
Hackensack, NJ 07601
(201) 488-8200
esmith@pashmanstein.com
ssamaro@pashmanstein.com
aoconnor@pashmanstein.com

# EXHIBIT B

# TO

# AFFIDAVIT

1

2           UNITED STATES DISTRICT COURT

3              DISTRICT OF NEW JERSEY

4    N.V.E. INC.,

5           Plaintiff,

6           vs.          No. 06-5455 (ES)(SCM)

7    JESUS J. PALMERONI, aka

8    JOSEPH PALMERONI, et al,

9           Defendants.

10   _____X

11   JESUS J. PALMERONI,

12           Third-Party Plaintiff,

13           vs.

14   ROBERT OCCHIFINTO and WALTER

15   ORCUTT,

16           Third-Party Defendants.

17   _____X

18

19        DEPOSITION OF VINCENT J. ROSARBO

20           Hackensack, New Jersey

21             December 11, 2015

22

23   Reported by:

24   MARY F. BOWMAN, RPR, CRR

25   JOB NO. 100718

Page 66

Rosarbo

1  affect my job or anything else. And then
2  about a month later or so, he had me go in
3  the office and he told me I had to go. And
4  I was -- actually, I was in shock to be
5  honest with you. That was it, I said I'm
6  sorry to hear that. I said why? He said,
7  because I can't afford you anymore. I
8  said, OK, so be it. I was let go with two
9  other people the same day.
10      Q.   Who else was let go that day?
11      A.   Bob Amilyon. And then there was
12  another Spanish kid who helped me,
13  actually, move the place from Sparta to
14  where we were. And I was kind of in shock
15  that he got let go also. But -- and that
16  was it.
17      Q.   And the Spanish kid, his name was
18  Carlos, is that what you recall?
19      A.   Yeah, that was -- exactly, yeah.
20      Q.   When you say there were some
21  issues with Ephedra, at this point in time
22  back in 2004, were there some issues where
23  there was talk that Ephedra might be
24  banned?

Page 67

Rosarbo

1      A.   Yes, exactly. That whole
2  scenario was happening, things were being
3  put on TV, you know, people were getting
4  sick over it, so to speak.
5      Q.   Did that affect the amount of
6  sales?
7      A.   At that time, no. We didn't hit
8  that brunt, but it was foreseen that this
9  was going to be happening and we tried to
10  change over into energy drinks. He was
11  trying to make a candy bar. I don't know
12  if he ever did. We were trying to do other
13  things besides Ephedra products.
14      Q.   And you got the three months
15  severance when you were let go by N.V.E.,
16  is that correct?
17      A.   Whatever that says, yes.
18      Q.   Does that sound right, three
19  months?
20      A.   I think it says more in there.
21      Q.   Do you want to look at it again?
22      A.   Yes, whatever that was. That
23  might have been I got medical -- you got
24  it, same thing? Yeah, three months, 12

Page 68

Rosarbo

1  weeks.
2      Q.   OK.
3      A.   And I was very disappointed by
4  it. But I left on good terms. I said
5  goodbye to everybody. I actually had tears
6  in my eyes, to be honest with you, but it
7  is what it is.
8      Q.   Did Mr. Palmeroni know that you
9  had a conviction, a federal conviction?
10      A.   Yes.
11      Q.   How did he know that?
12      A.   I told him. I mean, that's how
13  he knew how I met Bob.
14      Q.   Because you met at FCI
15  Lewisburg --
16      A.   Correct.
17      Q.   -- in the camp?
18          Did Mr. Palmeroni also tell you
19  that he had a conviction?
20      A.   Yes.
21      Q.   Did he tell you what that
22  conviction was for?
23      A.   No, he just told me the length of
24  the time. And I didn't push it.

Page 69

Rosarbo

1      Q.   Did it make much difference to
2  you at the time?
3      A.   No, no, it didn't.
4      Q.   Did it seem to make much
5  difference to him that you and Bob
6  Occhifinto have had convictions?
7      A.   No, not at all.
8      Q.   In your roles in sales for
9  N.V.E., you went to various conventions,
10  and trade shows and Nascar events where
11  there's an attempt to make sales or at
12  least talk to significant clients of N.V.E.
13  is that correct?
14      A.   Yes.
15      Q.   Are you also aware that N.V.E.
16  was not only selling product domestically,
17  but was exporting to Europe and other
18  places?
19      A.   Yes.
20      Q.   Were you aware at the time that
21  you were working for N.V.E. that the price
22  for the export goods was different than the
23  price for domestic goods?
24      A.   Not in the beginning because I

Rosarbo

wasn't aware of it at all. As we moved
forward, I got aware of it, yes.
    Q.   So you learned that somewhere
during your time working for N.V.E.?
    A.   Correct, yes.
    Q.   And the price for the export
goods, was that lower or higher than the
domestic price?
    A.   Lower.
    Q.   Was it approximately half of the
domestic price?
    A.   That, I don't know. I have no
clue what that price was. I know it was
lower for whatever reasons because it had
to be exported. It had to go -- whatever.
At least that was the scenario as to why it
had to be cheaper.
    MR. O'CONNOR: Can you read back
the answer.
    (Record read)
    Q.   If you don't remember the exact
difference in price, do you know whether it
was a significant difference in price?
    A.   It had to be because after I got

Rosarbo

involved with it, it showed that there was
different price breaks and there were
different profit margins. But the exact
price, I really don't know.
    Q.   And the product that was being
exported, was it the same product as was
being sold domestically?
    A.   Yes.
    Q.   The Stacker 2 20-counts would be
the same as Stacker 2 20-counts sold here
in the United States?
    A.   Yes.
    Q.   And that's true for the 100-count
bottles too?
    A.   Yes.
    Q.   What about other products, Yellow
Jacket and Black Beauty?
    A.   Yes, but I mean, they didn't buy
much of that. But yes, they are all in the
same scenario. Yes.
    Q.   Was most -- to your knowledge,
was most of the product being exported
Stacker 2?
    A.   Yes. 20-counts and 100-counts,

Rosarbo

yes.
    Q.   Did you know that one of N.V.E.'s
export clients was a company called Smart
World Netherlands?
    A.   Yes.
    Q.   And they were located in Holland?
    A.   Yes.
    Q.   And did you have any dealings
with Smart World Netherlands while you were
at N.V.E.?
    A.   Yes.
    Q.   What were your dealings with
Smart World Netherlands?
    A.   They were actually
Mr. Palmeroni's client. I got to know them
through him. And the dealings with them
were they bought product from us and they
distributed it overseas.
    Q.   Who did you deal with in Smart
World Netherlands?
    A.   I remember his first name, there
was a Jeroen.
    MR. VORT: Can you spell that.
    MR. O'CONNOR: I will get to the

Rosarbo

spelling in a second.
    A.   And then a Tom.
    Q.   So the fellow you were saying
Jeroen, do you remember it being spelled
J-E-R-O-E-N?
    A.   Yes.
    Q.   Do you remember his last name
being Gravelijn, G-R-A-V-E-L-I-J-N? Do you
recall that?
    A.   Yes.
    Q.   And the fellow, you said Tom or
Thomas?
    A.   Yes.
    Q.   Do you remember his last name
being Sikkink, S-I-K-K-I-N-K?
    A.   Yes.
    Q.   What were your dealings with
Mr. Gravelijn and Mr. Sikkink?
    A.   They would buy product at a price
and they put the order in and stuff would
get shipped to them. How they got their
pricing was between them. And Joe set up
the pricing, which then I didn't know what
that was until after the fact and then it

Page 74

Rosarbo

1  went on from there.  They would -- we would
2  contact each other and figure out what had
3  to be ordered.  Put the order into N.V.E.
4  pay for it, and then get it shipped.
5      Q.   So did you ever meet these two
6  fellows?
7      A.   I met them a couple of times, one
8  time we went over there.
9      Q.   Over where?
10     A.   Netherlands.  One time.  But I
11  met them one or two times in the States
12  when they came here.
13     Q.   So who went with you to Holland
14  or the Netherlands to meet with --
15     A.   Mr. Palmeroni.
16     Q.   -- to meet with Sikkink and
17  Gravelijn, who went with you?
18     A.   Mr. Palmeroni.
19     Q.   Anybody else?
20     A.   No.
21     Q.   And what were the nature of the
22  discussions between Palmeroni, yourself,
23  Gravelijn and Sikkink in the Netherlands?
24     A.   Actually, it was just to meet for

Page 75

Rosarbo

1  the first time and actually have a little
2  fun to be honest with you.  It wasn't much
3  business at all.  That's what I recall.
4      I finally got to meet them, where
5  they were. They took us out and it was kind
6  of like, I don't know, what kind of call
7  you want to say to do with a client, you
8  know, when you get together with a client
9  for the simple fact of good relations, good
10 rapport, whatever you want to call that.
11     Q.   Where did they take you out?
12     A.   Anywhere around the area.  Just
13 to -- I mean, actually, played a lot of
14 basketball. I mean, a couple of parties, a
15 couple of bars.  That's about it.  It was
16 only for a couple of days.  We both flew
17 first class.  It was around -- it was
18 around July.  I remember it was -- 4th of
19 July was close.
20     Q.   And you said you also met with
21 them here in the New York, New Jersey area?
22     A.   Well, yeah, they came to the
23 company.  I met them there.
24     Q.   I think you said Mr. Rosarbo that

Page 76

Rosarbo

1  orders would be placed for product.  When
2  someone like Smart World wanted to
3  purchase, orders would be placed, is that
4  right?
5      A.   Correct.
6      Q.   Can you tell us the process how
7  at that time, between 2000 and 2004, how
8  were orders placed?
9      A.   They were -- I had a rapport
10 through an e-mail.  At first, I was calling
11 them and then I set up an e-mail account.
12 And I had a rapport that I -- I was going
13 to place a certain amount, an order for
14 whatever it was.  And then they would place
15 the order to N.V.E. and it would get
16 paid, and then it would get manufactured,
17 and it would get shipped out.
18     Q.   And so if this was a legitimate
19 N.V.E. sale, what paperwork would you
20 generate to tell the folks in either
21 N.V.E. -- let me finish so you know what I
22 am talking about.
23     A.   Your right.
24     Q.   -- in the N.V.E. offices whoever

Page 77

Rosarbo

1  was handling that, did they know what the
2  sale was, billing, receiving part, what
3  kind of paperwork would be generated?
4      A.   By fax, they would fax in an
5  order, into the fax machine, and then our
6  order would be put into the area to go get
7  it processed.  And then when it was ready
8  for pick up, arrangements had to be made
9  for it to get picked up.  And that's
10 basically it.
11     Q.   So if they gave you an order by
12 telephone, would there have to be a fax or
13 could you tell someone that you had an
14 order for a certain amount of product?
15     A.   Yeah, I could have said that,
16 yeah.  It didn't have to be a fax.  We
17 could have done it directly.  But most of
18 the time, almost 99 percent of the time we
19 wanted a fax because we were having
20 problems with, well, I didn't order that, I
21 didn't order how much.
22     So after certain amount of time,
23 we wanted to do it by all by e-mail or by
24 fax.  But on the e-mail, you copied it

Page 78

Rosarbo

anyways and then proceeded to go, move forward.

Q.   Smart World Netherlands made a purchase of a certain amount of product and that either comes by fax or -- and that's given to someone in purchasing or in order to process that order, is that correct?

A.   Yes.

Q.   And then you said the product would either be manufactured or come out of inventory, is that fair?

A.   Correct.

Q.   And then what would happen to the product once it either was manufactured or was already in inventory?  What would happen, actually physically happen to that product?

A.   Well, arrangements had to be made for it to be picked up.

Q.   How did that happen?

A.   Shipping part.  I would contact a shipper and they would come and pick up the product.

Q.   It would be shipped to Holland,

Page 79

Rosarbo

presumably?

A.   Yes.

Q.   For a legitimate purchase?

A.   Correct.  Yes.

Q.   So a trucking company would have to come to the factory or warehouse, come get the product and take it away?

A.   Correct.

Q.   Then the folks at N.V.E., once it's given to the trucking company, have nothing more to do with it, correct?

A.   That's correct, yes.

Q.   And in terms of Smart World Netherlands, they were buying at the lower export prices, is that correct?

A.   Yes.

Q.   Did you recall if Smart World Netherlands is one of N.V.E.'s larger export customers?

A.   I don't know.  I mean, they had to be right there.  I tell you the truth, I'm not sure how many export customers they really had to be honest with you.  I don't know.

Page 80

Rosarbo

Q.   Was Smart World Netherlands the largest export company that you dealt with while you were at N.V.E.?

A.   Yes.

Q.   And do you know what their average purchase order would be in terms of dollars?

A.   25,-- 30,000.

Q.   At a time?

A.   Yes.

Q.   And during this time period, from say 2000 up until 2004, do you know whether N.V.E. sales were rising?

A.   Oh, yes, without a doubt.  When I was let go, he was grossing 10 million a month.

Q.   And so sales had gone up --

A.   Significantly.

Q.   Significantly?

A.   Yes.

Q.   During the time from when you started?

A.   Yes.

MR. VORT:  Could you read back

Page 81

Rosarbo

the answer please.

(Record read)

Q.   Mr. Rosarbo, did there come a time when you Mr. Palmeroni formed a company called Smart World here in the United States?

A.   Say that again.

Q.   Did there come a time when you and Mr. Palmeroni formed a company called Smart World here in the United States?

A.   Yes.

Q.   And how did that come about?

A.   It came about through getting mycorporation.com, through a computer, from Nevada and it came in a box and it showed you point blank how to set up a corporation.

Q.   And so whose idea was it to set up a company called Smart World in Nevada?

A.   Mr. Palmeroni's.

Q.   And did Mr. Palmeroni tell you what the purpose of setting up Smart World in the United States?

A.   As it was going on, no.  It was

Page 82

Rosarbo

1 done through the computer, it came and then
2 we started -- the idea came out as to why
3 to do it.
4    Q.  Tell me what you learned.
5    A.  Well, I learned that you can set
6 up Smart World, they can buy the product at
7 a certain price. It could get shipped, but
8 it doesn't have to get shipped overseas.
9 It gets shipped and stays in the United
10 States and gets sold at another price,
11 meaning that we had to open up another
12 corporation, which we did, called American
13 Wholesale. And that would be the
14 corporation that got paid for the product.
15    And then -- then the monies that
16 were generated in the American Wholesale
17 would be passed on to Smart World to repeat
18 the process.
19    Q.  So was this your idea to do this?
20    A.  No.
21    Q.  Whose idea was it?
22    A.  It was Joe's idea and then I ran
23 with it.
24    Q.  Whose idea was it to use the

Page 83

Rosarbo

1 Smart World name, the same as this company
2 in the Netherlands?
3    A.  Joe's idea. And the reason why I
4 say that is because Smart World was Joe's
5 client. I didn't know them. I didn't know
6 hardly any of the clients that bought the
7 product. I got to know them through my
8 boss, which was Joe Palmeroni. Then I
9 establish rapports with them.
10    Q.  In the beginning, did you have
11 any conversations with the Smart World
12 Netherlands people about setting up a Smart
13 World Company here in the United States?
14    A.  No.
15    Q.  To your knowledge, in the
16 beginning, did Mr. Palmeroni have any
17 conversations with the Smart World people
18 in the Netherlands about setting up a Smart
19 World Company in the United States?
20    A.  Was I witness to it in other
21 words?
22    Q.  We will start with that.
23    A.  No.
24    Q.  Did he tell you about it?

Page 84

Rosarbo

1    A.  No.
2    Q.  Do you know why the Smart World
3 Company was set up in Nevada as opposed to
4 another state?
5    A.  I was told because the way Nevada
6 is set up, there's significant layers that
7 you can't find out certain information.
8    Q.  And who told you that there were
9 layers?
10    A.  Mr. Palmeroni.
11    Q.  I am going to mark Exhibit 1
12 entitled Articles of Incorporation for
13 Smart World Inc. and on the bottom it's
14 marked as Sarinelli-Smart World-0019, 0020,
15 0021, 0022, 0023, and 0035.
16    (Exhibit 1, Articles of
17 Incorporation, document Bates stamped
18 Sarinelli-Smart World 0019 through 23
19 and 0035 marked for identification, as
20 of this date.)
21    Q.  Do you see that, sir?
22    A.  Yes.
23    Q.  Did you have a chance to look at
24 that?

Page 85

Rosarbo

1    A.  Um-hm.
2    Q.  Do you recognize that document?
3    A.  Yes, I do.
4    Q.  Are these the articles of
5 incorporation for Smart World Inc.?
6    A.  Well, that's what it says. But I
7 have different articles of incorporation
8 for this.
9    Q.  You do?
10    A.  Yes.
11    Q.  Can we ask that you provide us --
12 let me finish -- can we ask that you
13 provide us with a copy of those documents?
14    A.  Yes, yes. Actually, I'm sorry.
15 They're K-1s.
16    Q.  So that's a different document?
17    A.  OK, but they also state the
18 same -- not the same information. They
19 state two names, mine and Joe Palmeroni's,
20 50 percent stock, Joe Palmeroni, 50 percent
21 stock Vincent Rosarbo, and numbers that
22 were done for that year, for both
23 companies, Smart World and American
24 Wholesale.

Page 86

Rosarbo

Q. Mr. Rosarbo, I'm going to ask if
there are any documents related to Smart
World that have not already been produced
in this lawsuit, we are going to ask that
you provide us with copies.

A. OK.

Q. Let's just work on this document.
This is what we have in front of us. OK?

A. Sure.

Q. On the first page, 0019, it has
your name, Vincent Rosarbo, is that
correct?

A. Yes.

Q. And an address of 1 Madison
Avenue, Warminster, Pennsylvania, 18974.
Do you see that, sir?

A. Yes.

Q. Do you know why only your name is
on this -- let me finish -- if you are
saying the company was owned 50 percent by
yourself and Mr. Palmeroni?

A. No, I don't. And that address is
Joe's address.

Q. This Warminster address is

Page 87

Rosarbo

Mr. Palmeroni's address?

A. Yes, yes, his or his sister's,
one of the two. I don't even see a
signature on here that I even signed, so.

Q. The company didn't operate out of
Nevada, did it?

A. No. That was just the registered
agent.

Q. I believe on your tax returns,
you said that the company operated out of
New Rochelle, New York, is that correct?

A. That was where the checking
accounts were set up. And I can -- I'm
pretty sure, given the time, I can also go
there and produce the actual signatures
because we done that together.

Q. Who signed the signature cards --
let me finish -- so let me go back to where
I was. Who signed the signature cards for
the Smart World Inc. account?

A. Myself and Joe Palmeroni.

Q. Were there any other owners of
Smart World Inc. other than yourself and
Mr. Palmeroni?

Page 88

Rosarbo

A. No.

Q. Did anybody else other than
yourself or Mr. Palmeroni have access to
the Smart World Inc. bank accounts?

A. No.

Q. Did anyone else other than
yourself and Mr. Palmeroni have signature
authority over the Smart World Inc. bank
accounts?

A. No.

Q. And at the risk of being
repetitive, what was the ownership
breakdown between yourself and
Mr. Palmeroni with regard to Smart World
Inc.?

A. Equally distributed at 50
percent, equal stock.

Q. Back to New Rochelle. Why did
you decide to open a bank account in New
Rochelle, New York?

A. Logistics, it was kind of close
by from where we worked, if I -- basically
logistics. It was a Bank of America, but
basically logistics.

Page 89

Rosarbo

Q. New Rochelle is a fair distance
from Andover or Sparta. Isn't it?

A. Yes, but going all the way either
to Connecticut or some place else in
Pennsylvania -- it was kind of like a
middle point.

Q. You could have opened an account
in New Jersey, right?

A. Yeah, we could have.

Q. But you didn't?

A. No.

Q. That said, so is there any
discussion that you wanted to have a New
York bank account to make it look like
Smart World Netherlands?

A. No. That's -- that didn't come
into play, no. I didn't think it mattered
one way or the other. We didn't think of
that.

Q. Was Smart World Inc., your
company with Mr. Palmeroni, was that set up
to purchase N.V.E. product?

A. Yes.

Q. And was it set up to purchase

Rosarbo

N.V.E. product at the export price as
opposed to the domestic price?
   A.   Yes.
   Q.   Was Smart World Inc. set up to
take advantage of the similarity in name
with the Smart World Netherlands company?
   A.   Yes.
   Q.   The product that Smart World Inc.
was purchasing though, did you and
Mr. Palmeroni intend that you would resell
it in the United States?
   A.   Yes.
   Q.   Did either you or Mr. Palmeroni
have any intent to export any of the goods
purchased by Smart World Inc. outside of
the United States?
   A.   No.
   Q.   Did you ever tell Mr. Occhifinto
or anyone else at N.V.E. other than
Mr. Palmeroni that Smart World Inc. was
being used to purchase N.V.E. product at
the export price?
   A.   No.
   Q.   To your knowledge, did

Rosarbo

Mr. Palmeroni ever tell Mr. Occhifinto that
he was using Smart World Inc. to purchase
N.V.E. product at the export price?
   A.   No.
   Q.   Did you understand that if
Mr. Occhifinto found out that you were
purchasing product at the export price but
selling it domestically that he would try
and stop that?
   A.   Yes, although I didn't think it
would've got this far to be honest with
you. I thought -- I didn't think he would
give me a pass, don't get me wrong, but I
didn't think he would -- it would have
gotten this far.
   Q.   I understand. My question is
more narrow.
   A.   No, no.
   Q.   At the time this was happening --
   A.   No.
   Q.   -- let me finish.
   A.   Go ahead.
   Q.   Back in the time in the early
2000s, do you think he would have tried to

Rosarbo

stop it then if he found out about it?
   A.   Yes, yes, of course, yes.
   Q.   Our next exhibit, Mr. Rosarbo, is
going to be 2001, form 1120 income tax
return for Smart World Inc., which is
designated as Sarinelli-Smart World 0001.
      MR. VORT: This is Rosarbo 2?
      MR. O'CONNOR: Yes. Through what
appears to be 0034.
      (Exhibit 2, 2001 Income Tax
   Return for Smart World Inc., Bates
   stamped Sarinelli-Smart World 0001
   through 34 marked for identification,
   as of this date.)
   Q.   Do you recognize that document,
sir?
   A.   Yes.
   Q.   That's the tax return from 2001
for Smart World Inc., correct?
   A.   Yes.
   Q.   Now, there is a little blue tab
on page Sarinelli-Smart World-0030. Do you
see that?
   A.   Yes.

Rosarbo

   Q.   Just take a look at that. Does
that show that both you and Mr. Palmeroni
each owned 50 shares in Smart World Inc.?
   A.   Yes, it does. 50/50.
   Q.   Whose handwriting is that?
   A.   Down here? That's Joe
Palmeroni's handwriting.
   Q.   You are pointing to --
   A.   Talking about this?
   Q.   That's his signature where it
says signature of officer?
   A.   Yes.
   Q.   That's Mr. Palmeroni's?
   A.   Yes.
   Q.   What about up higher where it
says Jesus Palmeroni, in that set of boxes?
   A.   Yes, that also.
   Q.   Is?
   A.   Joe Palmeroni's signature, yes.
   Q.   The first box with the
handwriting that says "Jesus Palmeroni,"
not the actual signature. Do you see that?
   A.   Talking about right here?
   Q.   The first box here, first box on

Page 94

Rosarbo

the left, all the way on the left.

A.   First box on the left, it's printed.

Q.   Yes, whose handwriting is that?

A.   That's Joe Palmeroni.

Q.   Right below that, it says, in printed words, Vincent J. Rosarbo.  Do you see that?

A.   Yes.

Q.   Whose handwriting is that?

A.   That's mine.

Q.   Next to that, whose signature is that?

A.   That's mine.

Q.   That's your signature?

A.   Yes.

Q.   Mr. Rosarbo, can you tell me this idea of setting up a Smart World American company, how did that come up?

A.   Having discussions at his home.  Like I said, I was -- I started working there and I was traveling back and forth and it got too much for me.  So I started staying at his house.

Page 95

Rosarbo

Q.   Let me back this up.  There is a lot of information there.  So the N.V.E. office headquarters, factory, first it was in Sparta, New Jersey, correct?

A.   Yes.

Q.   At some point, they moved over to Andover, New Jersey?

A.   Correct.

Q.   You were living in Connecticut?

A.   Correct.

Q.   Somewhere just north of New Haven, is that correct?

A.   Yes, Branford.

MR. VORT: North of New Haven?

Q.   Then, sir -- stay with me.

So where was Mr. Palmeroni living at this time?

A.   That address, Huntington -- no.  I'm sorry, that's not it.  He was in -- he was in a place up near Great Mountain Gorge but not exactly up there.  Up near that area though.  He was renting out -- actually, I think he bought it, but don't quote me on it.  But it's a -- give me -- I

Page 96

Rosarbo

can't give you exact address.

Q.   New Jersey, Pennsylvania?

A.   No, it's New Jersey.  Vernon.  It was up in Vernon.

Q.   How far approximately is Vernon from Sparta?

A.   Forty minutes.

Q.   And Vernon from Andover?

A.   Vernon to Andover was further, about an hour.

Q.   How far from where you were in Connecticut to the N.V.E. offices?

A.   That was, that was a couple of hours easy.

Q.   So am I correct then that you would sometimes stay over at Mr. Palmeroni's house or apartment?

A.   Yes.

Q.   Because you were friendly at that time?

A.   Correct.

Q.   So this conversation about Smart World, did this take place at N.V.E. or did it take place at Mr. Palmeroni's apartment

Page 97

Rosarbo

or somewhere else?

A.   It took place at Mr. Palmeroni's apartment.

Q.   And tell me as much as you can remember about the first time that you and Mr. Palmeroni talked about setting up an American Smart World company?

A.   I mean, I don't know word for word.  He was playing around on the computer.  He showed me that you could order corporations off the computer mycorp.com.  It's a Nevada Corp.  We can open up a company.  And how it got into -- I don't recollect how it got into it being Smart World, but somehow it did.

You know, the first corporate -- we ordered two of them.  The first corporation being Smart World for the simple fact of buying product from Smart World and setting up a price limit and then ordering the next corporation which was American Wholesale.

Q.   Let me back you up.  Before you decide to go online and order the corporate

Page 98

Rosarbo

1
2  documents, is there any discussion as to
3  what you were going to do or how you were
4  going to make money?
5      A.   Yes, I was questioning it like,
6  you know, not too sure what you mean by
7  this. And why we have to do it in the
8  Nevada. And that's when I was educated
9  into the fact that there is not a lot of
10 layers there in Nevada. There is things
11 that you can hide, stuff to that -- which I
12 don't know. I mean, I just took his word
13 for it.
14         Now I know, yeah, you can do it
15 in Delaware. There is a couple of other
16 areas or states that you can just open up
17 corporations which -- without limit you.
18     Q.   But at the time, you understood
19 the reason for going to Nevada was so you
20 could hide your ownership interest in the
21 corporation?
22     A.   Yes, yes.
23     Q.   And by you, I mean both you and
24 Mr. Palmeroni?
25     A.   Yes.

Page 99

Rosarbo

1
2      Q.   But I want to know if there is
3  any conversation as to how you were going
4  to make money?
5      A.   Well, that came a little bit
6  later after we ordered the corporations.
7  And that's when I was told pricing would be
8  set up through the people in Smart World.
9  They will have a rapport with Bob. They
10 will set up the pricing there and product
11 will be ordered and then sold and put into
12 American Wholesale. And then they also
13 wanted money too.
14     Q.   Who is they?
15     A.   Jeroen and Tom.
16     Q.   Let me back you up. Obviously,
17 this case has been going on for a number of
18 years and we have been dealing with this a
19 number of years, Mr. Rosarbo.
20     A.   Yes.
21     Q.   I am trying to get back to
22 basics. I think you and I know a lot.
23     A.   OK.
24     Q.   Was there a conversation between
25 you and Mr. Palmeroni that you could make

Page 100

Rosarbo

1
2  money on the difference between the export
3  price and domestic price?
4         MR. VORT: Objection, leading.
5      Q.   Was there a conversation to that
6  effect or not?
7      A.   Yes.
8      Q.   About when did that conversation
9  take place?
10     A.   I don't know, a few months after
11 the corporations came and then we started
12 talking about -- they wanted a percentage
13 of what the profit was going to be because
14 it didn't happen over night.
15     Q.   So that was the folks in Smart
16 World Netherlands wanted a piece of the
17 action, is that right?
18     A.   Yes.
19     Q.   When you're setting up Smart
20 World in Nevada with Mr. Palmeroni, were
21 you both working for N.V.E. at that time?
22     A.   Yes.
23     Q.   And you were involved in sales at
24 that time?
25     A.   Yes.

Page 101

Rosarbo

1
2      Q.   And had Mr. Palmeroni become the
3  sales manager for N.V.E. at that point in
4  time?
5      A.   Yes.
6      Q.   So he had been promoted to head
7  salesman?
8      A.   Yes.
9      Q.   Prior to the time that you
10 actually set up the corporation in Nevada,
11 was there any discussion as to why you were
12 doing this and what would be the point of
13 it?
14     A.   Well, to earn money.
15     Q.   So there was a discussion prior
16 to the time you actually set the companies
17 up or at about the same time. Was there a
18 conversation between you and Mr. Palmeroni
19 about how you could use this to make money
20 for yourselves?
21     A.   Yes.
22     Q.   And was there a conversation
23 between you and Mr. Palmeroni about how it
24 was that you were going to make money with
25 this scheme?

Page 102

Rosarbo

A.   Yes.

Q.   And which was -- tell me about that.

A.   Well, buy -- set up the pricing from Smart World Netherlands to N.V.E. Pharmaceuticals, put an order in for the product through Smart World, pay for the product.

Once it's paid, you generate a copy to the fax that it was paid, hand it to shipping, shipping produces the product, and then you make arrangements for the product to be picked up and stored at a warehouse.

And then clientele actually -- the clientele was mostly Carlos, C.B., but there were other people who would call and place an order and their product would be shipped.  And I got -- OK, go ahead.

Q.   So presumably then you and Mr. Palmeroni would make a profit by selling it for more than what you purchased it for, correct?

A.   Yes.

Page 103

Rosarbo

Q.   Was it your plan at the time, you and Mr. Palmeroni to sell the product for less than what N.V.E. itself was selling the product for?

A.   Yes, because that was the only way we could move the product.  I mean, there was no reason to do it if we were going to sell it at the same price because it wouldn't have moved.  So we had to sell it at a cheaper price.

And when people started recognizing they could get it at a cheaper price, they wanted to buy more of it.

Q.   Did you understand that when you and Mr. Palmeroni were working for N.V.E., it was your job to sell product for N.V.E.?

A.   Of course, yes.

Q.   How did you find out who were going to be the customers of Smart World and American Wholesale?

A.   That was Mr. Palmeroni, most of it -- I'm going to say all of them because I didn't have any clients.  Most of the people who bought the product through those

Page 104

Rosarbo

two corporations were all Mr. Palmeroni's clientele.  And through his word of mouth, they would contact me and we would go from there.

Q.   When they contacted you, were you using a cell phone?

A.   Yes.

Q.   Was Mr. Palmeroni using a cell phone at that time?

A.   Yes.

Q.   Was he using that both for N.V.E. business and Smart World Inc. business?

A.   I would say yes.

Q.   Did you talk to Mr. Palmeroni on his cell phone about these Smart World Inc. sales?

A.   No.

Q.   You talked to him in person?

A.   Yes.

Q.   You mentioned Carlos, correct?

A.   Yes.

Q.   That's Carlos Bengoa, B-E-N-G-O-A?

A.   Correct.

Page 105

Rosarbo

Q.   And he ran a company called CB Distributors, is that correct?

A.   That's correct.

Q.   Was Carlos Bengoa and CB Distributors a customer of N.V.E.?

A.   Yes.

Q.   And did -- who suggested that you sell product directly to CB?

A.   That had to be a conversation between Mr. Palmeroni and CB because in the beginning for the first two, two and a half years, they were very close with each other.

And Mr.-- Carlos' business grew significantly from the time that I was hired up to a certain point.  So they had a good rapport with each other and that's how he ended up contacting me.  Actually, that's how I got to know him.  And they were together before I even got to the company.  Seven, eight months before that.

Q.   So CB and Carlos Bengoa was a customer of N.V.E. and Mr. Palmeroni had that account?

Page 106

Rosarbo

A.   Yes.  And I've had -- when I first met them, the reason why I am stating what I'm stating, is it seemed like CB was rivals with another company in Texas, a guy -- the owner was Ravi, R-A-V-I, and he wanted to grow his business the way his business was going, so it seemed like there was a rivalry there.

Q.   Let me get through some of the pronouns.  You are saying Carlos Bengoa wanted to grow his business?

A.   Well, they didn't like each other.

Q.   Carlos and Ravi?

A.   They were in competition.

Q.   So Ravi at that time had a bigger business than Carlos?

A.   Yes, and I'm -- from the conversations that we had, Joe and CB got together and CB started -- his business started growing through Joe and, eventually, through me.  To a point that he got to be a big player.

Q.   Did you and Joe Palmeroni sell

Page 107

Rosarbo

these export goods that have been diverted to CB?

A.   Yes.

Q.   Tell us how a transaction with CB would take place then.

A.   He would call me up and tell me what he wanted and I would place the order.

Q.   How would you place the order?

A.   Through a, um, e-mail, or if I was in the office.  Most of the time it was in the office.  I would place -- write a handwritten order to the office.  Hand it in.

Q.   That order, that handwritten order wouldn't say that it was an order for CB, would it?

A.   No.

Q.   Who would it say it was an order for?

A.   It was -- well, the product was already -- at the time, the product was already in the warehouse.  So CB would tell me -- I'm going to retract that, I'm sorry.  With CB, the product was already in the

Page 108

Rosarbo

warehouse.

Q.   When you say warehouse, whose warehouse?

A.   The warehouse that was set up for the product to go to before it went to overseas.

Q.   Let me back you up to try to --

A.   That's not a problem.

Q.   I want to make sure.  Presumably N.V.E. has a warehouse on site where it stores product?

A.   Yes.

Q.   Is that correct?

A.   Correct.

Q.   As part of the scheme with Smart World Inc., you and Joe had set up a separate warehouse here in New Jersey, is that correct?

A.   Correct.

Q.   And that is the Foremost warehouse?

A.   That's correct.

Q.   F-O-R-E-M-O-S-T?

A.   Yes.

Page 109

Rosarbo

Q.   Where was the Foremost warehouse located?

A.   It's in New Jersey.  Near Giant Stadium.

Q.   East Hanover?

A.   Yeah.

Q.   So how did you come upon the Foremost warehouse in East Hanover?

A.   We went riding around looking for warehouses and that happened to be an area where there were tons of them.  There was a whole mess of products that were being sold out of that warehouse.

Q.   So who found the warehouse?

A.   We both did.

Q.   You and Mr. Palmeroni?

A.   Yes.

Q.   So am I correct, sir, that through Smart World Inc. you and Mr. Palmeroni would set up an order for N.V.E. product, is that correct?

A.   Yes.

Q.   Primarily Stacker 2 20-counts?

A.   And 100-counts.

Page 110

Rosarbo

1
2   Q.   And 100-counts?
3   A.   Yeah.
4   Q.   Is it correct, sir, you would
5   claim that was an order from Smart World
6   Netherlands?
7   A.   Correct.
8   Q.   But the order was totally for
9   Smart World Inc. the United States company?
10   A.   Yes.
11   Q.   And then how would you pay for
12   that product?
13   A.   Through a wire transfer.
14   Q.   From?
15   A.   From Smart World Inc.
16   Q.   And that's the bank account you
17   set up at the Bank of America up in New
18   Rochelle?
19   A.   Yes.
20   Q.   Then after the product has been
21   ordered in the name of Smart World
22   Netherlands, would it say that the product
23   was supposed to be shipped or picked up to
24   go to the Netherlands?
25   A.   Yes.

Page 111

Rosarbo

1
2   Q.   So how did it come that the
3   product does not get shipped to the
4   Netherlands?
5   A.   Well, you have -- you set up a
6   warehouse --
7   Q.   This is the warehouse, Foremost
8   warehouse?
9   A.   Correct.
10   Q.   When you say "you," you set it up
11   right?
12   A.   Correct.  And once the product is
13   ready to be picked up, they were given
14   telephone numbers for them to pick up --
15   Q.   Who was given telephone numbers?
16   A.   They meaning the people in N.V.E.
17   gave them a telephone number to pick up the
18   product.  And they would come and pick it
19   up.
20   Q.   Slow down, I'm a little lost.
21   Who would you give a telephone number to?
22   A.   To shipping people at N.V.E.
23   would have the telephone number for
24   Foremost to pick up because that's how you
25   do it anyway.  It gets picked up from a

Page 112

Rosarbo

1
2   warehouse wherever.  And goes to a certain
3   area.  Now, if it is going overseas, it
4   goes to a shipping area that's going to be
5   taking it overseas.
6   Q.   Did Foremost -- is your deal with
7   Foremost, is that when they got a call from
8   N.V.E. that product was ready that Foremost
9   would send a truck up to get it to bring it
10   back to the Foremost warehouse?
11   A.   Yes.
12   Q.   And then --
13   A.   Then it sat there.
14   Q.   And then you and Mr. Palmeroni,
15   through Smart World or American Wholesale,
16   would arrange to pay Foremost, is that
17   correct?
18   A.   Through wire transfer, yes.
19   Q.   And would that --
20   A.   No, Foremost?  No, that was out
21   of a check from American Wholesale.
22   Q.   Who were the owners of American
23   Wholesale?
24   A.   Me and Joe Palmeroni.
25   Q.   And what was your split of

Page 113

Rosarbo

1
2   ownership of American Wholesale?
3   A.   Same as Smart World, 50 percent
4   each.
5   Q.   I think it was American Wholesale
6   Distributors.  Is that right?
7   A.   Yes.
8   Q.   A.W.D.?
9   A.   Correct.
10   Q.   We can take a five-minute break,
11   please.
12       (Recess)
13   Q.   I just want to talk a little bit
14   more about the purchase process.
15   A.   OK.
16   Q.   So if there was an order from CB
17   or anyone else who you were selling to
18   through the Smart World Inc. scheme, you
19   said that you would fill out a purchase
20   order.  Is that correct?
21   A.   Yes.  But that --
22   Q.   Let me finish --
23   A.   Go ahead.  I'm sorry.
24   Q.   So that's just a piece of paper?
25   A.   Yes.

Page 114

Rosarbo

Q. And that's something you would hand-write on?

A. Yes.

Q. And if I'm right, you would write there is an order from Smart World Netherlands, correct? That's what you would write on it --

A. No.

Q. What would you write on it?

A. What I would write was a purchase order for CB from American Wholesale.

Q. OK, we are talking about American Wholesale not --

A. Yes, Smart World was only there to exist to get the product at the overseas price. That's it. And then also to transfer money from American Wholesale into Smart World to redo the process again, because you had to pay the product through Smart World.

Q. That's how you paid N.V.E.?

A. Yes.

Q. So let me get this right. How does CB know how to deal with you?

Page 115

Rosarbo

A. Through Mr. Palmeroni.

Q. And the price that you and Mr. Palmeroni, the American Wholesale --

A. Negotiated price.

Q. Who negotiated the price with CB?

A. Mr. Palmeroni.

Q. How did you find out what the price was?

A. Mr. Palmeroni would tell me.

Q. Did he tell you this was the price we are going to charge CB for this amount of profit?

A. Correct.

Q. You would write up an order?

A. He would place an order.

Q. Who was he?

A. He, meaning Carlos, would place an order with me. I would write it up. I would fax it to him --

Q. To?

A. To Mr. -- to Carlos. To verify his order.

Q. OK.

A. And then I would contact Foremost

Page 116

Rosarbo

International, tell them the order, give them the address, you know. Sometimes CB even came and picked it up on his own. And the product would get shipped out to him.

Q. OK, so --

A. And then he would pay into American Wholesale.

Q. And then American Wholesale would transfer money to Smart World Inc.?

A. To redo the process.

Q. To pay N.V.E. to buy more product?

A. Correct -- yes. And sometimes there would be a surplus of money in American Wholesale. And that's when we would cut checks for each other that actually say on there corporate split.

Q. So it was your profits?

A. Correct.

Q. Let me move you over to the other side. So the product has to be ordered from N.V.E., is that correct?

A. The product has to be --

Q. The product has to be ordered

Page 117

Rosarbo

from N.V.E.? You were buying -- let me start again. You were buying N.V.E. product?

A. Yes.

Q. So somehow, Smart World Inc. has to order products from N.V.E., is that correct?

A. Yes.

Q. So can you explain the process of how Smart World Inc. would order product from N.V.E.?

A. Well, I would be -- they would call me.

Q. Who is they? You've got to use names.

A. Either Jeroen or Tom or they even had a brother-in-law or brother who worked in the warehouse. I don't know what his name was. But they would contact me either by fax machine if I was in the office, or -- I am sorry, never mind. I would contact them.

Q. You would contact the folks in the Netherlands?

Page 118

Rosarbo

A.    Yes, and tell them what I wanted. And then they would contact N.V.E. and place an order.

Q.    Place an order for stuff that they really were never going to get?

A.    Correct.

Q.    And the way they would find out is you would tell them what to order, is that correct?

A.    Right.

Q.    And then did that always happen that the order came from the folks in Netherlands? Or did you and Mr. Palmeroni ever just make up orders without going through the Netherlands?

A.    It always came from the folks through the Netherlands.

Q.    And then once that order was placed by the folks in the Netherlands, how did it get to the purchase folks at N.V.E.?

A.    OK, it was placed either by e-mail or fax. We would pick that up, meaning I would see the order, then I would place it with manufacturing, and then go

Page 119

Rosarbo

through the process of paying for it. Because once it was manufactured, it wouldn't get shipped out unless it was paid for.

Q.    If there is an order that comes on a fax machine, who do you physically hand that to?

A.    One of the girls who were working with us, they were the order placers. I don't remember the girls' names, there was a few of them.

Q.    You would hand them an order saying I have an order from Smart World Netherlands?

A.    Yeah, just give it to them. They type it in. Manufacturing would see it and they would start to do the process of either they had to make it or it was already inventory. They would have to package it up and get it ready for shipment. But it would never leave until it was paid up. That was the key with Smart World, it had to be paid up front.

Q.    After the order was paid for, do

Page 120

Rosarbo

you know what happened to that fax from the Netherlands? Did anyone keep it or throw it out, if you know?

A.    I don't know. But I'm guessing --

MR. VORT: Don't guess.

Q.    I just want to know if you know.

A.    OK. I don't know where it went.

Q.    What was in it for Jeroen and Thomas Sikkink in the Netherlands?

A.    At first, it was very minimal. 25 cents to 50 cents a bottle. Something like that, and then it grew, you know. I got word through Mr. Palmeroni that they wanted to be a real partner. Because I guess they seen how many orders were going through. So they wanted to earn more than what they were getting.

Q.    And all they were doing was letting you use their name, right?

A.    Correct, and also they negotiated the pricing.

Q.    With whom?

A.    Bob.

Page 121

Rosarbo

Q.    Did they negotiate with Bob Occhifinto or Mr. Palmeroni?

A.    Well, that, I don't know. It could have been both. I'm not sure. Because like I said, that was Joe's client. So he could have got the pricing -- they could have done it together, I'm not sure. But somehow or another, Bob got the pricing. Either directly through them --

Q.    You said Bob got the pricing. What do you mean?

A.    In other words, it was negotiated either directly through Smart World, through Joe, either one. Because it's only like a one-time thing. And then it stays like that for the longest time until somebody wants to either go up on the pricing or somebody wants to say I want to go down on the pricing.

Then it gets renegotiated again, but there is a big gap in between that happening that, you know, went on for a year, two years, whatever.

Q.    Did you ever negotiate a price

Page 122

Rosarbo

1
2 with Carlos or anyone at CB as to what they
3 would pay for the N.V.E. product?
4     A.   No.
5     Q.   Was it your understanding that
6 the price that either CB or other customers
7 that you had was less than the ordinary
8 N.V.E. domestic price?
9     A.   Yes.
10     Q.   What other customers through
11 Smart World Inc. and American Wholesale did
12 you have for N.V.E. product?
13     A.   Housholder, Brand New Energy. I
14 mean, there weren't too many. CB bought
15 three-quarters of it.
16     Q.   How about a company called I.S.G.
17 or International Sales Group?
18     A.   Yes.
19     Q.   Where are they located, if you
20 remember?
21     A.   I don't remember.
22     Q.   If I told you they were in Texas,
23 would that help you remember?
24     A.   Yes. Not that much though. The
25 big player was CB Distributors and next big

Page 123

Rosarbo

1
2 player was Housholder, Brand New Energy.
3     Q.   Who did you -- you dealt directly
4 with Aaron Housholder?
5     A.   Yes.
6     Q.   And did you negotiate the price
7 with Mr. Housholder?
8     A.   No.
9     Q.   How did you -- how was the price
10 set for Mr. Housholder?
11     A.   Through Mr. Palmeroni and then
12 me. I would be told also so that when he
13 called me, we knew right off the bat what
14 the pricing would be. And we would move
15 forward like that.
16     Q.   How did you come to sell product
17 to Mr. Housholder through American
18 Wholesale?
19     A.   Well, the same way. After a
20 while, I would just --
21     Q.   I want to back up. Very, more
22 simple question.
23     A.   Go ahead.
24     Q.   How were you introduced to
25 Mr. Housholder?

Page 124

Rosarbo

1
2     A.   Through Mr. Palmeroni.
3     Q.   Was it your understanding that
4 Brand New Energy and Mr. Housholder had
5 previously been clients of N.V.E.?
6     A.   Yes.
7     Q.   Did you ever sell product through
8 International Wholesale or to folks named
9 the Portzes?
10     A.   Yes, yes.
11     Q.   Where were they located if you
12 remember?
13     A.   I think they were in Arizona, I
14 think.
15     Q.   Let me back you up. When you
16 were dealing with Darren Housholder, did
17 you ever tell him your name was Jimmy?
18     A.   No.
19     Q.   Did you ever use Jimmy as an
20 alias?
21     A.   No, he probably thought Jimmy is
22 a nickname of Vinnie. But no, I never
23 actually told him that.
24     Q.   If you were dealing with people,
25 you always said this is Vinnie?

Page 125

Rosarbo

1
2     A.   It was a joke, my cousin Vinnie,
3 from Jersey City, I used to add to that.
4     Q.   I guess the movie was a little
5 closer in time.
6     A.   Yeah, without a doubt.
7     Q.   Which one of the Portzes did you
8 deal with, if you remember?
9     A.   Both. Mostly the son, but there
10 was a father involved too.
11     Q.   John?
12     A.   Yes.
13     Q.   Was it Darryl, the son?
14     A.   I think so, yup.
15     Q.   I am sorry, Jarrett,
16 J-A-R-R-E-T-T?
17     A.   Yes, yes.
18     Q.   Jarrett?
19     A.   Yes.
20     Q.   Did you ever deal with Katherine
21 Portz?
22     A.   No.
23     Q.   Who set up the price when you
24 were an dealing with the Portzes?
25     A.   Well, it had to be through Joe

Page 126

Rosarbo

and -- same scenario.

Q.   My question is, did you negotiate
pricing with them?

A.   No, I never negotiated pricing
with any of the customers because they
weren't my customers.  I didn't get to know
them until after they were already involved
and then I had a rapport with them.  But
they were all Joe's customers.  I didn't
know who they were.  I got to know them
through Joe.

Q.   The I.S.G. folks, do you remember
who you dealt with there?

A.   No, I don't.

Q.   Do you remember dealing with a
fellow named Ronald Sumicek?

A.   Yes, I remember him, yes.

Q.   Was that the fellow that you
dealt with?

A.   Yes, but he didn't get much from
what I understand.

Q.   But the --

A.   There is no -- go ahead.

Q.   Let me finish.

Page 127

Rosarbo

The few sales that you did with
I.S.G. and Mr. Sumicek, did you deal with
Mr. Ronald Sumicek?

A.   Yes, yes.

Q.   When someone like Sumicek, or
Housholder or CB would call you up, did
they say Joe gave me your name to talk to
you?  How did that conversation get
started?

A.   The first time.

Q.   Right?

A.   Let me back that up.  Some of
them, like CB, I met before we even did
that because they were -- they had a
rapport with Joe.  I mean, all of them did.
So some of them I met before that even
happened.  This didn't happen right away.

Q.   So a fellow like CB, they already
knew that you were working for N.V.E. at
the time?

A.   Yes.

Q.   Did the other folks know you were
working for N.V.E.?

A.   Yes.

Page 128

Rosarbo

Q.   And that includes Mr. Sumicek?

A.   Yes.

Q.   Mr. Housholder?

A.   Yes.

Q.   Either John or Jarrett Portz?

A.   Yes.

Q.   Did you also sell to Ravi?

A.   Very, very rare.  I got to meet
him.  We went there one time.  I seen his
warehouse, we meaning me and Mr. Palmeroni.

Q.   That would have been down in
Dallas, Texas?

A.   Correct.  But he was -- if
anything, it was very, very, very small
player as far as Smart World and American
Wholesale was concerned.

Q.   And do you remember that the name
of his business was called Import
Warehouse?

A.   Yes.

Q.   Is that right?

A.   Um-hm.

Q.   The time that you went down with
Mr. Palmeroni to Dallas to see these

Page 129

Rosarbo

warehouse operations, was that an N.V.E.
trip or American Wholesale trip?

A.   No, it was a N.V.E. trip.  It was
very early in the game.

MR. VORT:  Which warehouse was
that?

MR. O'CONNOR:  I believe that I
was asking about Import Warehouse --

THE WITNESS:  That was in Dallas.

MR. O'CONNOR:  In Dallas.

THE WITNESS:  Correct, yes.

Q.   Did you, Smart World Inc. or
American Wholesale, also sell to a company
called Quality King?

A.   Yes.

Q.   And that was a company here in
New Jersey?

A.   I believe so.  Don't quote me on
it.  I don't remember to be honest with
you.  I remember the name Quality King, I
don't remember where they were from.

Q.   Do you remember them being local
to New York, New Jersey area?

A.   Yes, that I do, yes.

Page 130

Rosarbo

Q.   Do you remember who you dealt
with there?
A.   No, I don't.
Q.   Do you remember a fellow named
Conetso? Caritzo?
A.   Yeah.
Q.   Which one was it?
A.   Canizzo, I think.
Q.   Canizzo? The Irish guy trying to
pronounce it.
A.   Yes.
Q.   Canizzo, C-A-N-I-Z-Z-O?
A.   I believe so, yes.
Q.   How did you get introduced to
either Mr. Canizzo or to the folks at
Quality King?
A.   The same way, through
Mr. Palmeroni. I believe they bought more
of the 100-count bottles.
Q.   When you're doing sales, you
generally will set up a credit for the
customer or did you demand payment be made
before the transaction?
A.   No, it wasn't -- I didn't get it

Page 131

Rosarbo

before the transaction. So when we were
doing it, we were put on the spot that way.
If they turned around and didn't pay, we
were on -- we were out of it. But I
trusted them that they would pay it because
they're making money and they want to
continue to do it. But I didn't get paid
for it up front. No.
Q.   Did you know that each of these
companies we have talked about, either CB,
or I.S.G., or Brand New Energy, or
International Wholesale, even Import
Warehouse or Quality King, had previously
been doing business with N.V.E.?
A.   Yes.
Q.   And they had good credit with
N.V.E.?
A.   Yes, yes, I believe so, yeah.
Q.   Were you involved ever in a sale
of a product called Black Ice?
A.   I knew of it, yeah. But I
don't --
Q.   What did you know?
A.   It was a company I think set up

Page 132

Rosarbo

with -- don't quote me on it, I think the
Portzes.
Q.   The Portzes or the Felices or was
it both? I'm not trying to change your
answer. I'm not trying to change your
answer.
A.   I don't know, I don't know. I'm
going to say the Portzes.
Q.   So the Portzes and who else. You?
A.   The Portzes -- Joe and myself.
Q.   And did you set up a separate
company to deal with that?
A.   I'm not sure, to be honest with
you, because I didn't handle that part of
it. So I'm -- I don't know. Honestly, I
don't know.
Q.   Who was handling that part of it?
A.   The Portzes, from what I gather.
Q.   From your side, who was handling
it, you or Mr. Palmeroni?
A.   It was Mr. Palmeroni.
Q.   This deal with the Portzes on
Black Ice, was that while you were working
at N.V.E.?

Page 133

Rosarbo

A.   Yes.
Q.   Was it while Mr. Palmeroni was
working at N.V.E.?
A.   Yes.
Q.   Was it at the time that he was
the national sales manager of N.V.E.?
A.   Yes.
Q.   Black Ice, was that a product
that was manufactured by N.V.E.?
A.   No.
Q.   Do you know who it was
manufactured by?
A.   No, I don't.
Q.   Was Black Ice a product that was
a competitor to Stacker 2 or --
A.   Yes.
Q.   And to the other Black Beauty and
Yellow Jacket?
A.   Yes, yes.
Q.   It was the same type of product?
A.   Yes.
Q.   When you were -- excuse me, take
that back.
     The price that American Wholesale

Page 134

Rosarbo

and you and Mr. Palmeroni charged folks like CB or the International Wholesale, would they all get the same price or were there different prices for them?

A.   No, they all got the same price.

Q.   And the price, I think you said before, was less than the N.V.E. domestic price?

A.   Correct.

Q.   And it was more than the N.V.E. export price that you purchased it for, correct?

A.   Yes.

Q.   That's how you made a profit, correct?

A.   Correct.

Q.   Was it -- do you know how close was the price to the N.V.E. domestic price?

A.   I'm not sure.

Q.   As you sit here today, I think you said most of the stuff you were selling through American Wholesale and Smart World Inc. was the 20-count Stacker 2s, and the 100-count Stacker 2s?

Page 135

Rosarbo

A.   Yes.

Q.   That would be the majority of the product?

A.   Yes.

Q.   Do you recall, as you sit here today, what American Wholesale was charging for, per bottle of 20-count stacker 2s?

A.   What I was getting from --

Q.   What you were charging CB, International Wholesale?

A.   $2.20 a bottle. I believe.

Q.   Approximately, $2.20 a bottle?

A.   Yes, for the 20-counts. The 100-counts, I don't remember. They were definitely more, but I don't remember.

Q.   Do you recall what Smart World Inc. was paying to buy that product from N.V.E.?

A.   No, I don't. It was a dollar and change, I just don't know exactly, 1.25, 1.30.

Q.   In that neighborhood between 1.25 and 1.30?

A.   Yes, I believe so, yes. If he

Page 136

Rosarbo

goes back, he'll know. But I don't know.

Q.   And I think you said before that the domestic price was approximately 2.75?

A.   The wholesale price, yes, was $2.75. Then they flipped it over anywhere between 5 to 7 to 10 dollars.

Q.   I'm just staying with the wholesale price right now.

A.   Yes.

Q.   Is this a good time to take a break.

     (Luncheon recess)

     (Continued on next page)

Page 137

Rosarbo

AFTERNOON SESSION

1:43 p.m.

BY MR. O'CONNOR:

Q.   You referred earlier to a product called Black Beauty. Do you remember that?

A.   Yes.

     MR. VORT:  Black -- what was the name of the product?  Black Video?

     MR. O'CONNOR:  Beauty.

Q.   If I tell you now, would it refresh your recollection to tell you the product was actually called Black Jax, does that sound right?

A.   Yes.

Q.   B-L-A-C-K, J-A-X?

A.   I remember that name, yes.

Q.   When you heard the Black Beauty, were you referring to something called Black Jax?

A.   No, Black Beauty was just a stronger stimulant --

Q.   You think there was another product by that name?

A.   Black Jax, yes, I've heard that.

Page 260

1                        Rosarbo

2                   CERTIFICATE

3      STATE OF NEW JERSEY )

4                          )ss:

5      COUNTY OF UNION    )

6           I, MARY F. BOWMAN, a Registered

7      Professional Reporter, Certified

8      Realtime Reporter, and Notary Public

9      within and for the State of New Jersey,

10     do hereby certify:

11          That VINCENT J. ROSARBO, the

12     witness whose deposition is

13     hereinbefore set forth, was duly sworn

14     by me and that such deposition is a

15     true record of the testimony given by

16     such witness.

17          I further certify that I am not

18     related to any of the parties to this

19     action by blood or marriage and that I

20     am in no way interested in the outcome

21     of this matter.

22          In witness whereof, I have

23     hereunto set my hand this 23rd day of

24     December, 20*Mary F. Bowman*

25          MARY F. BOWMAN, RPR, CRR

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF CONNECTICUT
### (NEW HAVEN DIVISION)

| | |
|---|---|
| IN RE: | Case No. 3:17-BK-31250 (AMN) |
| VINCENT ROSARBO & ANGELINA ROSARBO, | |
| Debtors | |
| N.V.E., INC., | |
| Movant | |
| v. | |
| VINCENT ROSARBO and KARA S. RESCIA, CHAPTER 7 TRUSTEE, | August 23, 2017 |
| Respondents. | |

## NOTICE OF CONTESTED MATTER RESPONSE DATE

N.V.E., Inc. ("the Movant") has filed a Motion for Relief from Stay ("the Contested Matter") with the U.S. Bankruptcy Court. Notice is hereby given that any response to the Contested Matter must be filed with the Court no later than September 6, 2017. In the absence of a timely filed response, the proposed order in the Contested Matter *may* enter without further notice and hearing, *see* 11 U.S.C. section 102(1).

Dated:  August 23, 2017

By: */s/ Thomas J. Sansone*

Thomas J. Sansone (Federal Bar No. ct00671)
Carmody Torrance Sandak & Hennessey LLP
195 Church Street, P.O. Box 1950
New Haven, CT 06509-1950
Telephone:  (203) 777-5501
Fax No. (203) 784-3199
E-mail:  tsansone@carmodylaw.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**(NEW HAVEN DIVISION)**

| | |
|---|---|
| IN RE: | Case No. 3:17-BK-31250 (AMN) |
| VINCENT ROSARBO & ANGELINA ROSARBO, | |
| Debtors | |
| N.V.E., INC., | |
| Movant | |
| v. | |
| VINCENT ROSARBO and KARA S. RESCIA, CHAPTER 7 TRUSTEE, | |
| Respondents. | |

**PROPOSED ORDER GRANTING MOTION FOR**
**RELIEF FROM STAY, FILED BY N.V.E., INC.**

WHEREAS, the Movant, N.V.E., Inc., has, pursuant to Bankruptcy Rules 4001 and

9013, moved for an Order that the stay imposed by Section 362(a) of the Bankruptcy Code be

modified to permit the Movant to continue its prosecution of a certain prepetition action

commenced by them in the United States District Court for the District of New Jersey, titled

N.V.E., Inc. v. Jesus J. Palmeroni a/k/a Joseph Palmeroni, et al Civil Action No. 06-cv-5455

(GEB (ES) ("the New Jersey Federal Court Action"); and

WHEREAS, the Court, having found that notice of such motion was duly provided to

all parties entitled to such notice; and

{N5395084}

WHEREAS, following a hearing on such motion at which all parties in interest were given the opportunity to appear and be heard thereon,

IT IS HEREBY ORDERED:

The Movant's motion is granted, and the automatic stay shall be lifted to permit the Movant to continue its prosecution of the New Jersey Federal Court Action, and

IT IS FURTHER ORDERED:

That, during the pendency of the prosecution of the New Jersey Federal Court Action, including any appeals thereof, the Adversary Proceeding filed by the Movant against the Debtor, Vincent Rosarbo, in this Court, Adversary Proceeding No. 17-03013 ("the Adversary Proceeding"), shall be stayed, until a final judgment is entered in the New Jersey Federal Court Action, and

IT IS FURTHER ORDERED

That the final judgment entered in the New Jersey Federal Court Action shall be binding upon this Court with respect to its adjudication upon the Adversary Proceeding.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## (NEW HAVEN DIVISION)

| | |
|---|---|
| IN RE: | Case No. 3:17-BK-31250 (AMN) |
| VINCENT ROSARBO & ANGELINA ROSARBO, | |
| Debtors | |
| | |
| N.V.E., INC., | |
| Movant | |
| v. | |
| VINCENT ROSARBO and KARA S. RESCIA, CHAPTER 7 TRUSTEE, | August 23, 2017 |
| Respondents. | |

### CERTIFICATE OF SERVICE

In accordance with the applicable provisions of the Federal Rules of Bankruptcy Procedure, 2002 and 7004, the undersigned certifies that on the 23rd day of August 2017, the following documents were served on the U.S. Trustee and all appearing parties via the court's electronic filing system or, by first class mail on the parties listed in section 2 below.

1.      **Documents Served:**

      1.      Motion for Relief from Stay filed by N.V.E., Inc.

      2.      Proposed Order

      3.      Notice of Contested Matter

{N5395091}

2.    **Parties Served Via First Class Mail:**

     1.    Vincent Rosarbo and Angelina Rosarbo (*the Debtors*)
           23 Thistle Meadow Lane
           Branford, CT   06405

Dated:  August 23, 2017     By: */s/ Thomas J. Sansone*
                                 Thomas J. Sansone (Federal Bar No. ct00671)
                                 Carmody Torrance Sandak & Hennessey LLP
                                 195 Church Street, P.O. Box 1950
                                 New Haven, CT 06509-1950
                                 Telephone:  (203) 777-5501
                                 Fax No. (203) 784-3199
                                 E-mail:  tsansone@carmodylaw.com